[No. E049093. Fourth Dist., Div. Two. Feb. 8, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL JESUS MORENO, Defendant and Appellant.

## Counsel

Kevin D. Sheehy, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Lilia E. Garcia and Jeffrey J. Koch, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

## KING, J.—

### I. INTRODUCTION

Defendant was convicted by a jury of first degree murder. (Pen. Code, § 187, subd. (a).)[1] The jury also found true an allegation that, in committing the murder, defendant personally used a deadly and dangerous weapon, a knife. (§ 12022, subd. (b)(1).) In a bifurcated trial, the court found true allegations that defendant had suffered a prior strike conviction (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)), a prior prison term for a violent felony (§ 667.5, subd. (a)), and prior prison terms for two other felonies (§ 667.5, subd. (b)). He was sentenced to an aggregate term of 50 years to life, plus one year.

On appeal, defendant contends: (1) The trial court erred in refusing to conduct an in camera review of documents in the personnel file of the victim, a former peace officer, pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305] (*Pitchess*) and related law; (2) the use of a Spanish language interpreter for a juror requires reversal; and (3) the admission into evidence of certified records of his prior convictions deprived

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

him of his Sixth Amendment right of confrontation. We agree with defendant's first argument and reject the other arguments. Accordingly, we will conditionally reverse the judgment to permit the court to conduct the necessary in camera review and make appropriate orders based on such review.

## II. FACTUAL SUMMARY

On November 25, 2005, defendant and Tami Potter, a former San Bernardino County probation officer, argued in the hallway of a sober living house in San Bernardino.[2] At some point during the argument, Potter said that someone had taken $80 that belonged to her. She told defendant she was going to "handle my business" and pushed defendant in the chest with her hands. Defendant unsheathed a knife and stabbed Potter multiple times, killing her.

James Walker, a resident of the house, was awakened by the argument. When he heard a woman scream, "help me," he opened his bedroom door. He saw Potter collapse onto the floor with blood squirting from her neck or shoulder area. Defendant was behind Potter. Defendant then ran away from Potter, yelling, "Fuck you, bitch. That's what you get. That's what people like you deserve."[3] Defendant was holding a white cloth covered in blood that appeared to be wrapped around something. Defendant ran to Potter's truck and drove away.

Later that day, defendant arrived at Debbra Garrett's apartment with one or two duffle bags. Defendant remained inside the apartment for the next two days.

On November 27, 2005, police saw Potter's truck at Garrett's apartment building. With Garrett's consent, they searched the apartment and found defendant lying on a bed. When defendant sat up on the bed, he said, "I can't believe I got caught," and "this was a short run." On a dresser in the bedroom, the police found defendant's wallet and a balloon. Inside the balloon was a newspaper article about Potter's murder. Defendant's duffle bag contained a narcotics pipe with methamphetamine residue, a knife with

---

[2] A sober living house was described during trial as "a location where individuals who are attempting to rehabilitate themselves from drug addiction, alcoholism, will live in a communal environment and try to help each other recover from drug addiction."

[3] These statements by defendant were introduced through Detective Michael Vasilis. Detective Vasilis testified that he interviewed Walker the day of the murder and that Walker told him he heard defendant make these statements. Detective Vasilis's testimony was given after Walker denied the statements and testified he did not see defendant at the house after the stabbing.

dried blood on its blade, and a black Solo brand windbreaker saturated with blood. DNA testing showed the blood on the knife, windbreaker, and defendant's shoes to be Potter's blood. Blood was also found on the interior of Potter's truck.

Detective Vasilis interviewed defendant. According to defendant, he and Potter were in a "struggle" and argued that day. She was, in his words, "very disrespectful to me"; "Called me [a] fucking bitch. You little fuckin' pig. You're going to be my little bitch." Potter told defendant that someone took $80 from her and that she was " 'about to handle my business. I'm gonna fuck somebody up.' " Potter then "pulled around on" defendant and pushed him in the chest. Defendant was aware that Potter was a former law enforcement officer who worked in juvenile hall and knew how to "restrain" defendant. He was scared and believed "she was about to do something to" him. He "snapped" and "defended himself." He unsheathed his knife and stabbed Potter multiple times. He then ran to Potter's truck and drove away. Defendant told Detective Vasilis he was wearing a Solo windbreaker at the time of the stabbing.

A pathologist testified that Potter suffered three stab wounds; two in the front upper part of Potter's chest, and one in the back. The wounds indicated they were caused by a knife. The pathologist could not identify the sequence in which the wounds were inflicted. Potter died "in a matter of minutes" of being stabbed. She did not have any "defensive wounds"; that is, a wound that suggests the victim was trying to protect herself from attack. The pathologist testified the absence of defensive wounds could mean that the victim was overpowered so rapidly she had no chance to defend herself. It could also mean the victim was somewhat incapacitated or impaired because of drug use.

Potter had both methamphetamine and marijuana in her body at the time of her death. According to the pathologist, the methamphetamine had been consumed "not too long before she died." Methamphetamine has a stimulant effect that can cause people to become agitated, anxious, or potentially violent.

## III. ANALYSIS

### A. *Denial of Defendant's* Pitchess *Motion*

Defendant contends the court erred in refusing to conduct an in camera review of material contained in Potter's personnel file. We agree.

### 1. *Factual and Procedural Background*

Prior to trial, defendant filed a motion for discovery of material in Potter's personnel files concerning, among other matters, Potter's "use of force in general when effectuating an arrest and when supervising detainees in custody in adult and juvenile facilities . . . ." The materials sought allegedly related to potential claims, defenses, or impeachment concerning Potter's use of "[e]xcessive force . . . , violence, attempted violence, hostility, aggression, assaultive behavior, and/or proclivity for violence." (Fn. omitted.) The motion was made pursuant to, among other authorities, *Pitchess* and Evidence Code sections 1043 through 1047.

The motion was supported by a declaration of defendant's counsel and a copy of a police report concerning Potter's murder. Defendant's counsel stated that Potter "has up to 10 years of employment with the San Bernardino County Probation Department." The attorney did not indicate whether Potter was employed as a probation officer at the time of her murder or, if not, when her employment terminated. (According to the People's written opposition to the motion, Potter was not employed as a probation officer at the time of her death.)

Defendant's counsel further stated: "I am informed and believe that on occasion probationers, juveniles, arrestees, or the attorneys, friends, or relatives of such arrestees and probationers, make complaints to said agency concerning its law enforcement officers. These complaints allege that the officers committed acts of unnecessary or excessive force, professional misconduct, acts demonstrating racial or ethnic prejudice, acts of illegal arrest and improper search and seizure, and acts of dishonesty."

Regarding the materiality of the information sought, defendant's counsel stated that the material "is necessary in order to properly prepare the case for trial and is material and relevant for the following reasons: [¶] . . . The defense expects to show that if in fact the defendant was, in any manner, combative, it was in defense to the officer's excessive, unreasonable, and unwarranted force—including the officer['s] act of threatening defendant and pushing her hand into defendant's chest. The defense is informed and believes that the officer's use of force will either serve as an affirmative defense to the charges or mitigate the nature of the charges. The material sought may contain complaints of a like nature made by other citizens against these officers. Such information would be used by the defense to locate and call witnesses to testify that this officer .has a character trait, habit, and custom for engaging in excessive and illegal force, drug abuse, and acted aggressive while under the influence of controlled substances. Further, said

information will assist the defense in that it would show a tendency or propensity on the part of the officer herein to engage in the use of unlawful and excessive force."

Counsel further stated: "The psychological records in question are material to the defense of this action for they will permit the defense to ascertain whether the officer has a history of violence and an inability to effectively control her aggressive impulses. Such being the case, defendant could show his actions were responsive to the aggressive and unwarranted advances by the officer in question. Such materials would be beneficial for two reasons. First they would serve to impeach any witness accounts that defendant was the aggressor when he stabbed Potter. Since Potter's history and background of engaging in other similar acts would be relevant at trial, the information sought herein is material for the defense of self-defense, imperfect self-defense, to establish a lack of planning and premeditation, and that any actions leading to Potter's death were in defense of or in response to her aggressive actions, threats, and assaultive behavior."

The copy of Detective Vasilis's police report submitted with defendant's motion states that a resident of the house told Detective Vasilis that he heard Potter and defendant arguing over defendant taking Potter's truck. When Potter screamed, the resident opened his door and saw Potter running down the hallway with blood squirting from her chest area. He saw defendant standing in the hallway with blood on his jacket and holding an object wrapped in a white cloth, which was covered in blood. The resident heard defendant yell at Potter, " 'Bitch, that's what you get, that's what happens to people like you.['] " Defendant then ran from the house, got into Potter's truck, and drove away.

The police report also described Detective Vasilis's interview with defendant. The defendant told Detective Vasilis that he had asked Potter why she was accusing him of taking $80 from her, and she said someone took it and she was about to handle her business. Potter then "put her hand on [defendant] and pushed him in the chest." When she did this, defendant "snapped" and stabbed Potter.

The trial court denied the motion, stating the "[d]eclaration is woefully insufficient" and that defendant had not "set forth sufficient grounds" for the motion.

### 2. *Legal Principles*

█ A defendant has a limited right to discovery of a peace officer's confidential personnel records if those files contain information that is

potentially relevant to the defense. (*Pitchess, supra,* 11 Cal.3d at pp. 537–538; *California Highway Patrol v. Superior Court* (2000) 84 Cal.App.4th 1010, 1019 [101 Cal.Rptr.2d 379]; Evid. Code, §§ 1043–1047.) A probation officer is such a peace officer. (Pen. Code, § 830.5.)

To initiate discovery, a defendant must file a motion seeking such records, containing affidavits "showing good cause for the discovery or disclosure sought, setting forth the materiality thereof to the subject matter involved in the pending litigation . . . ." (Evid. Code, § 1043, subd. (b)(3).) Good cause requires the defendant to establish a logical link between a proposed defense and the pending charge and to articulate how the discovery would support such a defense or how it would impeach the officer's version of events. (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1021 [29 Cal.Rptr.3d 2, 112 P.3d 2] (*Warrick*).)

█ The threshold for establishing good cause is " 'relatively low.' " (*Warrick, supra,* 35 Cal.4th at p. 1019; see *City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 83 [260 Cal.Rptr. 520, 776 P.2d 222].) The proposed defense must have a "plausible factual foundation" supported by the defendant's counsel's declaration and other documents supporting the motion. (*City of Santa Cruz v. Municipal Court, supra,* at p. 86.) A plausible scenario "is one that might or could have occurred." (*Warrick, supra,* at p. 1026.) The "defendant must also show how the information sought could lead to or be evidence potentially admissible at trial . . . . Once that burden is met, the defendant has shown materiality under [Evidence Code] section 1043." (*Ibid.*)

"If the defendant establishes good cause, the court must review the requested records in camera to determine what information, if any, should be disclosed. [Citation.] Subject to certain statutory exceptions and limitations [citation], 'the trial court should then disclose to the defendant "such information [that] is relevant to the subject matter involved in the pending litigation." ' [Citations.]" (*People v. Gaines* (2009) 46 Cal.4th 172, 179 [92 Cal.Rptr.3d 627, 205 P.3d 1074].)

We review the denial of a *Pitchess* motion for abuse of discretion. (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039 [130 Cal.Rptr.2d 672, 63 P.3d 228]; *People v. Memro* (1995) 11 Cal.4th 786, 827 [47 Cal.Rptr.2d 219, 905 P.2d 1305].)

### 3. *Discussion*

In light of the low threshold for obtaining an in camera review of the requested materials, we believe the court erred in denying defendant's motion. The People do not dispute there is a logical link between the crime

charged (murder) and the proposed defenses—pure or imperfect self-defense, or the absence of planning and premeditation. According to defendant's counsel, defendant acted in self-defense to Potter's "excessive, unreasonable, and unwarranted force—including [Potter's] act of threatening defendant and pushing her hand into defendant's chest." This is not inconsistent with defendant's statements in the police report that Potter was telling defendant that someone had taken $80 from her, that she was going to take care of business and then pushing defendant in the chest, and that defendant then "snapped."

■ Defendant's actions, his counsel further asserts, "were responsive to the aggressive and unwarranted advances by [Potter]." Although the People assert that this scenario is "of extremely questionable plausibility," that is not the test. The factual plausibility requirement is satisfied if the scenario described by counsel "is one that might or could have occurred." (*Warrick*, *supra*, 35 Cal.4th at p. 1026; see *People v. Sanderson* (2010) 181 Cal.App.4th 1334, 1340 [105 Cal.Rptr.3d 326] [Fourth Dist., Div. Two].) Based upon the documents submitted in support of the motion, the aggression described by counsel might have occurred. If it did, the actions could support arguments that defendant did not plan or premeditate the killing of Potter and that he acted in pure or imperfect self-defense. Evidence, including material in Potter's personnel file, indicating that Potter had a propensity for violence or aggressive behavior is potentially relevant to such defenses. (See *Pitchess*, *supra*, 11 Cal.3d at p. 537; Evid. Code, §§ 1103, 1105.) Therefore, defendant satisfied the low threshold required to obtain an in camera review of discoverable material.[4]

■ The People assert that defendant "failed to provide any facts identifying officer misconduct." Potter, they point out, had been a probation officer, but was not so employed at the time she was killed. They appear to argue that the discovery procedure applies only to peace officers who are employed as such at the time of the crime. They do not cite any authority for this argument. Although cases involving the discovery of peace officer personnel records will usually involve alleged "misconduct" of officers *qua* officers, there is nothing in Evidence Code section 1043 or case law that limits the procedure in this way. (See *People v. Superior Court (Gremminger)* (1997) 58 Cal.App.4th 397, 407 [67 Cal.Rptr.2d 910] [People must comply with Evid.

[4] In addition to opposing defendant's motion in its entirety on the ground defendant failed to establish good cause, the People asserted below that any discovery must be limited to the names, addresses, and telephone numbers of complainants and witnesses. The People further argued that discoverable material cannot include psychological reports or information concerning conduct that occurred more than five years before Potter's death. Finally, they argued that any disclosure must be pursuant to a protective order. These arguments were not addressed by the trial court and the issues have not been briefed on appeal. Therefore, we do not address them. Following remand, the trial court may consider such arguments.

Code, § 1043 et seq. to obtain personnel records of former police officer].) Nor would such a limitation make sense. Material in a peace officer's personnel file that is relevant and potentially exculpatory does not become less so merely because the officer is no longer in the employ of a law enforcement agency. (Cf. *People v. Superior Court (McKunes)* (1976) 62 Cal.App.3d 853, 857 [133 Cal.Rptr. 440] [personnel file of police officer who was victim of assault was discoverable even though the officer was off duty at the time of the assault].)

(5) The remedy for a failure to conduct an in camera review in this situation was established in *People v. Gaines, supra,* 46 Cal.4th 172. As the *Gaines* court explained, the proper remedy "is not outright reversal, but a conditional reversal with directions to review the requested documents in chambers on remand." (*Id.* at p. 180.) "After reviewing the confidential materials in chambers, the trial court may determine that the requested personnel records contain no relevant information." (*Id.* at p. 181.) If so, the trial court shall reinstate the judgment. (*Ibid.*) Even if the in camera review reveals relevant information, reversal is not necessarily required. The defendant "must also demonstrate a reasonable probability of a different outcome had the evidence been disclosed." (*Id.* at p. 182.)[5] If the defendant does demonstrate such a probability, the court must order a new trial; if he does not, the judgment shall be reinstated. (*People v. Gaines, supra,* at pp. 181–182.) The court shall follow this procedure following remand.

B. *Use of Spanish Interpreter for Juror*

The court provided a Spanish language interpreter to one juror, Juror No. 7, for use throughout the trial and deliberations. Defendant contends the use of an interpreter indicates the juror lacked sufficient knowledge of the English language and was therefore unqualified to be a juror. He further argues that allowing this juror to sit and deliberate in his case violated his California state constitutional right to a jury of 12 competent jurors. We find the argument is not supported by the record and has been forfeited by the failure to challenge the juror's qualifications below.

At the outset of juror voir dire, jurors were asked to respond orally to 14 written preliminary questions. The court told the person ultimately selected as

---

[5] Under a separate heading, defendant contends the denial of his *Pitchess* motion deprived him of his federal constitutional rights to due process, confrontation, compulsory process, a fair trial, and a meaningful opportunity to present a complete defense. If there was any such error, the remedy is the same. (See *Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 58 [94 L.Ed.2d 40, 107 S.Ct. 989]; *People v. Gaines, supra,* 46 Cal.4th at pp. 184–185.) Because we are reversing on state law grounds and direct the trial court to conduct an in camera review of discoverable material, we need not reach the federal law issues.

Juror No. 7: "[W]e are assisting you with the Spanish language interpreter. I'm going to ask you to answer our questions on the form. You may do it in English or Spanish, whichever is more comfortable for you. I just need you to pick one." The court reporter noted, in parentheses immediately preceding the juror's response, "In English." After giving his name, the juror stated: "I live in Yucaipa. I'm married. I have two daughters. One is nine years old. And the other one is seven years old. [¶] I work for the San Bernardino City Unified School District. [¶] I have no jury experience." He responded to other questions and, in response to a question asking whether he had any reason why he could not or did not want to serve as a juror, he concluded: "I don't have any problem to be here."

Juror No. 7 interacted with counsel during voir dire at least five times. Each time, the reporter did not indicate whether the juror spoke in English or used an interpreter. In the last interaction with counsel, the prosecutor asked, "does it bother you at all to have an interpreter?," to which the juror responded, "Not me, no."

The record does not reflect any discussions during jury selection among the court and counsel concerning Juror No. 7, his ability to understand English, or his use of an interpreter. Neither party inquired about his ability to understand English, challenged him for cause, or otherwise objected to his competency to act as a juror. Both counsel accepted the panel of jurors that included Juror No. 7 without exhausting their peremptory challenges and stipulated to having the interpreter present during deliberations.[6] Other than minute orders reflecting the presence or use of an interpreter for Juror No. 7, the record does not disclose the manner in which, or the extent to which, the interpreter was used.[7]

During a discussion among the court and counsel concerning jury instructions, the court referred to an instruction concerning the use of a juror interpreter based on CALCRIM No. 120. The court mentioned that he had never seen such an instruction and that it "[s]eems to be working fine." A further discussion took place concerning the possible playback of a DVD during jury deliberations. The court stated: "I've never had it happen before and the interpreter has previously been sworn as an oath of the interpreter, obviously, the interpreter will have to be present during jury deliberations or

---

[6] The jurors were given the following instruction based on Judicial Council of California Criminal Jury Instructions, CALCRIM No. 120: "During the trial, Juror No. 7 has been assisted by a Spanish-English interpreter. The Spanish-English interpreter is not a member of the jury and is not to participate in the deliberations in any way other than as necessary to provide service to Juror No. 7."

[7] Minute orders regarding two days of the trial state that an interpreter was "present"; minute orders for three days of the trial state that an interpreter "interprets for juror #7"; and the minute order for one day of the trial makes no mention of an interpreter.

[*sic*] an interpreter. We will instruct them, of course, that they can't do anything but interpret which is their general instructions anyway. Just in an abundance of caution, both sides waive any defect or problem with having a 13th person in the jury deliberations room in the form of an interpreter for Juror No. 7?" Counsel for both parties agreed.

After the verdict, the court thanked the jurors for their service and added: "Just historically, . . . this is the first time since I've been practicing law since 1969 . . . that we have actually had a juror with an interpreter and it seemed to have worked well. I don't think it interrupted anybody or caused any problem. Hope it worked out for you, sir. And it was an interesting experience also for the interpreter, because they haven't done that before either. Let you know how that worked. Thanks again. You are excused." There is nothing in the record that indicates or suggests the use of an interpreter had any effect on the proceedings or jury deliberations.

The requirement that California jurors understand English is statutory. Code of Civil Procedure section 203 provides: "All persons are eligible and qualified to be prospective trial jurors, except the following: [¶] . . . [¶] (6) Persons who are not possessed of sufficient knowledge of the English language . . . ." (*Id.*, subd. (a).) A person with sufficient knowledge of English is one who is fully able to understand spoken and written English. (*People v. Jones* (1972) 25 Cal.App.3d 776, 783 [102 Cal.Rptr. 277].)

Based on our record, we cannot say that Juror No. 7 lacked sufficient knowledge of English to be a juror. The record discloses that the court provided him with an interpreter, but the court's reasons for doing so are not revealed. Although we appear to have a complete transcript of the jury selection proceedings, the record does not indicate that Juror No. 7 asked for an interpreter or gave the court any reason to believe he needed or desired an interpreter. When the juror was told he could answer the court's preliminary questions in English or Spanish, he was able to read the questions and respond in English. So far as we can tell, he gave no indication he had difficulty understanding a question; nor do his responses suggest a lack of familiarity with English. Even if he thereafter used an interpreter, such use may indicate merely that English was not his primary language and he might have benefitted from the interpreter. However, that fact does not, by itself, prove he did not have sufficient knowledge of English to qualify as a juror. In short, defendant has failed to establish that Juror No. 7 was not fully able to understand spoken and written English.

Even if it was shown that Juror No. 7 did not understand English, defendant forfeited his argument by failing to challenge the juror's qualifications or otherwise object below.

■ A party may challenge an individual juror for cause based on the juror's lack of qualification or competency to act as a juror. (Code Civ. Proc., §§ 225, subd. (b)(1)(A), 228, subd. (a).) The challenge must be made before the jury is sworn. (*Id.*, § 226, subd. (a).) "[A] defendant's objection to a juror's competency, first made after trial, is belated and not cognizable on appeal." (*People v. Hill* (1992) 3 Cal.4th 959, 985 [13 Cal.Rptr.2d 475, 839 P.2d 984], overruled on another point in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618].) This rule has long been applied to arguments challenging a juror's qualifications for the first time on appeal. (See, e.g., *People v. Mortier* (1881) 58 Cal. 262, 267; *People v. Plum* (1929) 97 Cal.App. 253, 255–256 [275 P. 518]; *People v. Duncan* (1908) 8 Cal.App. 186, 197–198 [96 P. 414]; *People v. McFarlane* (1903) 138 Cal. 481, 490 [71 P. 568].)

In *People v. Sanford* (1872) 43 Cal. 29, our state Supreme Court rejected a belated challenge to a juror's competency, stating: "It was the duty of the defendant in the first place to have examined him [(the juror)] as to his competency in the respect referred to at the time the jury was impaneled. He does not seem to have made any objection to his competency even afterwards, but took his trial before him with a knowledge of the fact [of the alleged incompetency]. Having deliberately taken his chance of a favorable verdict, he cannot be heard to object now that a juror of his own choosing was lacking in a qualification of this technical character." (*Id.* at pp. 31–32.)

Our state Supreme Court "more forcefully reiterated this view in *People v. Mortier*[, *supra,*] 58 Cal. 262: ' "To permit prisoners to avail themselves, after verdict, of preexisting objections to the competency of jurors, as a matter of right, would not only be unreasonable, but most mischievous in its consequences. . . . A prisoner *knowing* or willfully remaining ignorant of the incompetency of a juror, would take the chances of a favorable verdict with him upon the jury; and if the verdict should be adverse, would readily enough make the affidavit necessary to avoid its effect." ' [Citation.]" (*People v. Hill, supra,* 3 Cal.4th at pp. 985–986, overruled in part on another point in *Price v. Superior Court, supra,* 25 Cal.4th at p. 1069, fn. 13; see also *People v. Green* (1995) 31 Cal.App.4th 1001, 1016 [38 Cal.Rptr.2d 401] [acknowledging "the long-standing rule that a defendant who knew about a juror's incompetency or who should have discovered the incompetency on voir dire may not raise the objection after trial."].) These authorities control the question presented here.[8]

---

[8] None of the authorities cited by defendant for the proposition that a defendant has a right to raise for the first time on appeal fundamental constitutional jury trial rights involve the failure to challenge a juror's qualifications. (See *People v. French* (2008) 43 Cal.4th 36, 46 [73 Cal.Rptr.3d 605, 178 P.3d 1100]; *People v. Saunders* (1993) 5 Cal.4th 580, 589, fn. 5 [20

Here, defendant assumes that Juror No. 7 "need[ed]" an interpreter and argues that this need "was a sufficient 'red flag' to put the trial court on notice of the juror's statutory incapacity to sit on the jury." The court, he argues, should have made inquiries into the juror's ability to understand English and discharged the juror. Even if we accept defendant's assumption that the juror *needed* a Spanish interpreter, the same red flag was equally apparent to him. Yet, he never voir dired the juror as to his ability to understand English, challenged the juror for cause, or expressed any concern whatsoever about his qualification to be a juror. Having accepted Juror No. 7 for his jury, without making any inquiry into the juror's alleged grounds for disqualification, he cannot be heard to complain about such qualification after the time permitted to do so. Defendant has therefore waived or forfeited the argument for appeal.

Even if the argument had not been waived or forfeited, defendant has failed to explain how the use of an interpreter for Juror No. 7 prejudiced him in any way. As the court stated, "it seemed to have worked well." There is nothing in the record to suggest otherwise. There is no indication that any evidence or instruction was mistranslated or misunderstood by Juror No. 7, or that the use of the interpreter caused any distraction to any other juror or witness, resulted in any delay in the proceedings, or had any effect on deliberations. Accordingly, even if the argument had not been waived and the court erred by allowing Juror No. 7 on the jury, the error was harmless.[9]

## C. *Section 969b Packet and the Confrontation Clause*

■ A bifurcated court trial was held on the allegations that defendant had certain prior convictions and prison terms. At the outset of this trial, defendant moved to exclude evidence offered pursuant to section 969b, commonly referred to as a "969b packet." Section 969b permits the use at trial of certified records of penal institutions to establish that a person has been convicted of a crime or has served time in a penal institution.[10] In this case, the 969b packet included fingerprint cards, abstracts of judgment,

---

Cal.Rptr.2d 638, 853 P.2d 1093]; *People v. Holmes* (1960) 54 Cal.2d 442, 443–444 [5 Cal.Rptr. 871, 353 P.2d 583].) They are therefore inapposite.

[9] Although we find no basis for reversing the judgment based on defendant's arguments and the record concerning the use of an interpreter in this case, we note our concern about providing interpreters to jurors and make clear we do not endorse the practice. Although the use of the interpreter apparently caused no problem in this case, the *potential* for problems, including possible mistranslation and distraction of other jurors, as well as the questionable use of scarce judicial resources, weigh heavily against such use. (See, e.g., *People v. Lesara* (1988) 206 Cal.App.3d 1304, 1309–1310 [254 Cal.Rptr. 417] [identifying potential problems arising from use of interpreters for jurors].)

[10] Section 969b provides: "For the purpose of establishing prima facie evidence of the fact that a person being tried for a crime or public offense under the laws of this State has been convicted of an act punishable by imprisonment in a state prison, county jail or city jail of this State, and has served a term therefor in any penal institution, or has been convicted of an act in

Federal Bureau of Investigation forms, a photograph, and a Department of Corrections and Rehabilitation log reflecting a chronological history of actions pertaining to defendant. The documents are accompanied by a cover page with the official stamp of the Department of Corrections and Rehabilitation and the statement, "I certify that this is a true and correct copy of the original documents contained within our records," followed by an individual's signature and a date.

Defendant argued that the admission of the 969b packet violated his Sixth Amendment right of confrontation and cross-examination. The court denied the motion and allowed the prosecution to introduce such records. On appeal, defendant contends this was error. We disagree.

■ A criminal defendant has a federal constitutional right "to be confronted with the witnesses against him . . . ." (U.S. Const., 6th Amend.; see *Pointer v. Texas* (1965) 380 U.S. 400, 403 [13 L.Ed.2d 923, 85 S.Ct. 1065].) In *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*), the high court held that the admission at a trial of out-of-court testimonial statements violates a criminal defendant's right to confrontation, unless the declarant of the statement is unavailable at trial and the defendant has had a prior opportunity to cross-examine him or her. (*Id.* at pp. 54, 68.) Although the *Crawford* court left "for another day any effort to spell out a comprehensive definition of 'testimonial' " (*id.* at p. 68, fn. omitted), it articulated a "core class of 'testimonial' statements" covered by the confrontation clause (*Crawford*, at p. 51). These include " 'ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' [citation]; 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' [citation]; 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . .' [citation]." (*Id.* at pp. 51–52.)

■ In *People v. Taulton* (2005) 129 Cal.App.4th 1218 [29 Cal.Rptr.3d 203] (*Taulton*), the court addressed the question whether section 969b is unconstitutional in light of *Crawford*. (*Taulton, supra*, at p. 1222.) The

any other state, which would be punishable as a crime in this State, and has served a term therefor in any state penitentiary, reformatory, county jail or city jail, or has been convicted of an act declared to be a crime by any act or law of the United States, and has served a term therefor in any penal institution, the records or copies of records of any state penitentiary, reformatory, county jail, city jail, or federal penitentiary in which such person has been imprisoned, when such records or copies thereof have been certified by the official custodian of such records, may be introduced as such evidence."

*Taulton* court held that the statute did not violate the confrontation clause. The records described in section 969b, the court explained, "are prepared to document acts and events relating to convictions and imprisonments. Although they may ultimately be used in criminal proceedings, . . . they are not prepared for the purpose of providing evidence in criminal trials or for determining whether criminal charges should issue. Therefore, these records are beyond the scope of *Crawford*, and the court properly admitted them and considered them for the statutory purposes." (*Taulton, supra,* at p. 1225.)

*Taulton* was followed in *People v. Morris* (2008) 166 Cal.App.4th 363 [83 Cal.Rptr.3d 253] (*Morris*), which held that a certified California Law Enforcement Telecommunications System rap sheet was admissible as proof of prior prison terms. (*Id.* at p. 373.) The *Morris* court explained that, like the 969b packet in *Taulton*, the certified rap sheets in *Morris* were not prepared for the primary purpose of providing evidence at trial, but "to permit law enforcement to track necessary information regarding the arrest, conviction, and sentencing of individuals and to communicate that information to other law enforcement agencies." (*Morris, supra,* at pp. 370–371, fn. omitted.) For this and other reasons, the certified rap sheets "are not testimonial hearsay and their admission did not violate defendant's right to confront and cross-examine the witnesses against him under *Crawford* . . . ." (*Id.* at p. 373.)

Defendant asserts that *Taulton* is no longer viable in light of the Supreme Court's recent decision in *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. ___ [174 L.Ed.2d 314, 129 S.Ct. 2527] (*Melendez-Diaz*).[11] We disagree.

In *Melendez-Diaz*, the high court held that certificates or affidavits signed under oath by forensic analysts affirming that a substance found in the defendant's possession was cocaine, fell within the " 'core class of testimonial statements' " described in *Crawford*. (*Melendez-Diaz, supra,* 557 U.S. at p. ___ [129 S.Ct. at p. 2532].) The documents in that case were, the court explained, "quite plainly affidavits: 'declaration[s] of facts written down and sworn to by the declarant before an officer authorized to administer oaths.' [Citation.] They are incontrovertibly a ' "solemn declaration or affirmation made for the purpose of establishing or proving some fact." ' [Citation.]" (*Ibid.*) "[M]oreover, not only were the affidavits ' "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," ' [citation], but under Massachusetts law the *sole purpose* of the affidavits was to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substance, [citation]. We can safely assume that the analysts were aware of the affidavits' evidentiary purpose, since that purpose—as stated in the relevant state-law provision—was reprinted on the affidavits themselves."

---

[11] Defendant does not mention *Morris*.

(*Ibid.*) Therefore, the court concluded "the analysts' affidavits were testimonial statements, and the analysts were 'witnesses' for purposes of the Sixth Amendment. Absent a showing that the analysts were unavailable to testify at trial *and* that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to ' "be confronted with" ' the analysts at trial. [Citation.]" (*Ibid.*, fn. omitted.)

The *Melendez-Diaz* court considered and rejected an argument that the forensic analysts' reports were not subject to the confrontation clause because they were " 'akin to the types of official and business records admissible at common law.' " (*Melendez-Diaz, supra*, 557 U.S. at p. ___ [129 S.Ct. at p. 2538].) The high court made clear that "[b]usiness and public records are generally admissible absent confrontation . . . because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." (*Id.* at pp. ___–___ [129 S.Ct. at pp. 2539–2540].) The court explained that the analysts' certificates in the case before it do not qualify as business or public records because they were " 'calculated for use essentially in the court, not in the business.' " (*Id.* at p. ___ [129 S.Ct. at p. 2538].)

Initially, it appears to us that defendant is asserting a different argument on appeal than the one asserted below. To the trial court, defendant argued that the documents comprising the 969b packet, such as the inmate's chronological history, are prepared in anticipation of litigation and to prove the truth of the prior convictions. On appeal, his argument is focused not on the records within the 969b packet, but on the Department of Correction and Rehabilitation's clerk's accompanying certification that the documents within the packet are true and correct copies of the department's records. We reject both arguments.

 Defendant provides no support for the assertion that the documents within the 969b packets were "crafted in anticipation of being used in future court proceedings," let alone that their primary or sole purpose was to provide evidence in a subsequent prosecution. (See *Davis v. Washington* (2006) 547 U.S. 813, 822 [165 L.Ed.2d 224, 126 S.Ct. 2266]; *Melendez-Diaz, supra*, 557 U.S. at p. ___ [129 S.Ct. at p. 2539].) Based on our review of the documents within the packet, we agree with the *Taulton* court's statement that they "are prepared to document acts and events relating to convictions and imprisonments." (*Taulton, supra*, 129 Cal.App.4th at p. 1225.) As such, they are created primarily for the administrative purposes of the Department of Corrections and Rehabilitation. "Although they may ultimately be used in criminal proceedings, . . . they are not prepared for the purpose of providing evidence in criminal trials or for determining whether criminal charges should issue." (*Ibid.*) Nothing in *Melendez-Diaz* implies a rejection of *Taulton*.

Indeed, *Melendez-Diaz* strengthens *Taulton*'s holding because, as the high court made clear, documents "created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial . . . are not testimonial." (*Melendez-Diaz, supra,* at pp. ___–___ [129 S.Ct. at pp. 2539–2540].)

In support of his argument, defendant states that section 969b "states expressly that such certified priors packets are '[*f*]*or the purpose of establishing prima facie evidence* of the fact that a person being tried for a crime or public offense under the laws of this State, has been convicted of an act punishable by imprisonment in a state prison, county jail or city jail of this State, and has served a term therefor in any penal institution . . . .' " The argument is based upon a misconstruction of the statute. By placing his own words, "such certified priors packets," in front of the statutory language, defendant has made it appear that the purpose of *creating* the documents within the 969b packet is to establish evidence. It is clear from the statute (see *ante,* fn. 10), however, that the opening words—"For the purpose of establishing prima facie evidence" (§ 969b)—describe the limited evidentiary purpose for which the documents may be introduced at trial, not the reason for their existence.

 We also reject the argument emphasized on appeal—that the clerk's certification of the 969b materials is testimonial. *Melendez-Diaz* also addressed this argument. The high court distinguished the forensic analysts' reports, which were testimonial, from a clerk's certificate authenticating an official record for use as evidence. (*Melendez-Diaz, supra,* 557 U.S. at p. ___ [129 S.Ct. at p. 2539].) A clerk, the court explained, "could by affidavit *authenticate* or provide a copy of an otherwise admissible record, but could not do what the analysts did [in *Melendez-Diaz*]: *create* a record for the sole purpose of providing evidence against a defendant." (*Ibid.,* fn. omitted.) The clerk's certification of the materials in the 969b packet here is precisely the kind of authenticating affidavit approved of in *Melendez-Diaz.*

## IV. DISPOSITION

The judgment is conditionally reversed. Upon request by defendant following remand, the trial court shall conduct an in camera review of the discoverable material in Tami Potter's personnel file. If the trial court's inspection reveals no relevant information, the trial court must reinstate the judgment of conviction and sentence. If the inspection reveals relevant

information, the trial court must order disclosure, allow defendant an opportunity to demonstrate prejudice, and order a new trial if there is a reasonable probability the outcome would have been different had the information been disclosed. In all other respects, the judgment is affirmed.

Hollenhorst, Acting P. J., and Miller, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 11, 2011, S191414.