Filed 2/4/21  P. v. Babbitt CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MONTAVIOUS DAYTRON BABBITT,<br><br>Defendant and Appellant. | B302271<br><br>(Los Angeles County<br>Super. Ct. No. BA466562) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Affirmed and remanded with directions.

Leonore De Vita, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy

Attorney General, and Rene Judkiewicz, Deputy Attorney General, for Plaintiff and Respondent.

_____

A jury found Montavious Daytron Babbitt guilty of attempted murder. He challenges his jury, the testimony of his victim, a gang enhancement, and his fines and fees. We affirm and correct the abstract of judgment.

Unspecified statutory citations are to the Penal Code.

I

On March 6, 2018 at about 10:00 p.m., Jason Smith went to a marijuana dispensary at the corner of Figueroa and Slauson. He saw two younger men as well as another man he would later learn was Babbitt standing out front.

One of the younger men asked Smith where he was from. Smith replied he was "not gang affiliated," "no gangbanging." Babbitt and the two other men kept asking Smith, "Where you from?" Smith repeatedly answered, "I don't gangbang." All three men warned Smith he was in "Hoover area." Babbitt told Smith Babbitt was "from Hoover."

One of Babbitt's companions pulled a knife. Smith responded in kind. Babbitt and the two men ran. Smith began to chase them but then left.

Smith realized he lost his wallet and returned a few minutes later to look for it. At least two other people were in the area, including a woman who said "He's back. He came back." Smith found his wallet and then saw the three men he had chased earlier walking toward him. Babbitt's two companions ran the opposite way. Babbitt pulled a gun and fired four or five shots. One of the shots hit Smith in the lower part of his right leg.

An information charged Babbitt with one count of attempted murder.  (§§ 664, 187, subd. (a).)  It alleged Babbitt committed the attempted murder to benefit a gang (§ 186.22, subd. (b)(1)(C)) and he personally used a firearm (§ 12022.53, subds. (b), (c), & (d)).  The information also alleged the offense was a serious felony (§ 1192.7, subd. (c)(8)) and a violent felony (§ 667.5, subd. (c)(8)).

Trial lasted two days and four witnesses testified for the prosecution.

On May 8, 2019, after jury selection and sometime after 3:00 p.m., the court heard a motion from the People about Smith's unavailability.  Smith did not come to court that morning as scheduled.  An investigator for the Los Angeles District Attorney testified about his efforts to locate Smith.  We recount these efforts in detail later in this opinion.

The court found that Smith's failure to appear demonstrated he was unwilling to cooperate, the People exercised reasonable diligence, and the People demonstrated Smith was unavailable.  The court would allow the People to introduce Smith's preliminary hearing testimony as a statement by an unavailable witness.

On May 9, 2019, the next day, Smith again failed to arrive at court in the morning.  After opening statements and testimony from one witness, the People introduced Smith's preliminary hearing testimony to the jury.  A reader read Smith's testimony.  The People and Babbitt's attorney read their own questions from the prior testimony.  In this testimony, Smith identified Babbitt as the shooter.

Next, Detective Ryan Bellows testified.  He investigated the shooting.  Bellows obtained surveillance video from the area.

3

The People played several of those video clips. Bellows was familiar with Babbitt and had met Smith in connection with the case.

Video matched the account of Smith arriving, leaving, and returning. One clip showed a person getting out of a car and walking toward the dispensary. The detective identified Babbitt on the sidewalk. Two minutes later, the car left. A few minutes after that, the car returned and the person got out a second time. A minute later, he walked with a limp back to the car.

In another video clip, a person the detective had identified as Babbitt ran with two other people through the parking lot near the dispensary. Another clip showed a fourth person chasing three people through the lot. One clip showed a person who looked like Babbitt raising an object in his hand at the front of his body.

Another video showed a person who looked like Smith walking on the sidewalk, bending down, and then looking startled. He walked with a limp back to a car and left.

At trial sometime after 3:00 p.m. on May 9, 2018, the People announced Smith had arrived at court. They called Smith to testify. Babbitt made no objection.

Smith explained he did not come to court in the morning because he had been stabbed and was at a hospital. He had stitches in his hand.

Smith testified about the shooting. As in his preliminary testimony, he identified Babbitt as the shooter. The People played a portion of one of the videos for Smith. Smith identified himself and Babbitt in the video.

4

Officer Charles Kumlander testified. On March 21, 2018, he arrested Babbitt in front of the marijuana dispensary at Figueroa and Slauson.

Los Angeles Police Officer Matthew Clark testified as a gang expert. Clark monitored a gang called the "5-2 or Five-Deuce Hoovers." He believed Babbitt was in that gang. The People offered Clark a hypothetical question about a shooting that tracked many of the facts of Babbitt's case. Clark believed the hypothetical shooting would be for the benefit of a gang. We provide additional details about Clark's testimony later in this opinion.

The jury deliberated for fewer than three hours before returning a verdict. It found Babbitt guilty of attempted murder and found the gang and firearm enhancements to be true.

After the clerk read the guilty verdict, Babbitt requested the court poll the jury. Each juror individually agreed the guilty verdict was that juror's own verdict.

The court sentenced Babbitt to 42 years to life in prison. The sentence was composed of the middle term of seven years for attempted murder, plus 10 years due to the gang enhancement (§ 186.22, subd. (b)(1)(C)), plus 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)). The court imposed but stayed additional sentences of 20 years (§ 12022.53, subd. (c)) and 10 years (§ 12022.53, subd. (b)) for the two other firearm enhancements.

The court ordered Babbitt to pay a $300 fine (§ 1202.4, subd. (b)), a $40 court operations assessment (§ 1465.8, subd. (a)(1)), and a $30 criminal conviction assessment (Gov. Code, § 70373). The court imposed a $300 parole restitution fine

5

(§ 1202.45) but suspended this fine unless a court revoked his parole.

## II

Babbitt raises two issues about his jury.  Neither warrants reversal.

## A

Babbitt incorrectly says his conviction must be reversed because a member of his jury, Juror No. 9, was unqualified.  He forfeited this claim by failing to challenge the juror at trial.  His trial counsel was not ineffective for failing to raise a challenge.

We provide background about the juror's voir dire and then we address forfeiture and Babbitt's ineffective assistance of counsel claim.

The court asked the jurors nine preliminary questions.  The first four questions were about the prospective jurors' area of residence, marital status, job, and family.  The next five questions were about whether they had ever been a juror, crime victim, or crime witness; whether they had a close relationship with someone in law enforcement or with someone arrested or charged with a crime; and whether they had had a negative experience with law enforcement.

Juror No. 9 responded, "Hi.  I live in L.A.  Married.  Self-employed.  No kids.  And all answers, no."  The court asked, "what kind of business do you have?"  Juror No. 9 responded, "Online business."  The court asked whether her husband worked and she said "Yes."  He was a driver.

The court asked all the potential jurors another series of questions.  The final question was, "Is there anything that you'd like to tell me as to why you could not sit on this trial or why you could not be fair or impartial in this case?"  The court and Juror

6

No. 9, whom the transcript calls "Prospective Juror No. 9," had the following exchange:

> Prospective Juror No. 9: I don't quite understand all of the whole conversation. So like, the terminology, some of the, like, criminal or something related that I think I can try.
>
> The Court: You speak English very well.
>
> Prospective Juror No. 9: I can understand, like, the basic, whatever you talk later, but the previous, I can't understand, even saying what's the—what's the point. I didn't get it.
>
> The Court: I think you're—you should give yourself a little bit more credit, and I'll give you what the definitions are of certain terms.

Later, Babbitt's trial attorney, Marko Zubcic, asked the jurors questions. He had the following exchange with Juror No. 9:

> Mr. Zubcic: We're also going to hear terms—and I believe, Juror No. 9, you mentioned that you're having a little trouble with the terminology. So when the judge mentioned "beyond a reasonable doubt," are you having trouble understanding terms like that?
>
> Prospective Juror No. 9: Like, some—some typical words—like, I really don't understand, yeah.
>
> Mr. Zubcic: Okay. If you get a definition—for instance, the judge will later explain what the meaning is. Will that help you?
>
> Prospective Juror No. 9: I think so.
>
> Mr. Zubcic: Okay. All right. Thank you.

Babbitt challenged one juror for cause. That juror said someone had murdered his son five months ago, so the juror felt

he would be biased.  Babbitt exercised eight peremptory challenges.  The court allowed all of these challenges.

Babbitt and the People accepted a jury panel that included Juror No. 9.

After the court swore in the jury, Juror No. 9 told the court clerk her father had been a police officer in another country.  The court told Babbitt and the People about this.  Babbitt made no comment or objection.

1

A person without "sufficient knowledge of the English language" is not eligible to be a juror (Code Civ. Proc., § 203, subd. (a)(6); see also § 1046), but Babbitt did not challenge Juror No. 9 for cause nor did he use a peremptory challenge to strike her.  He therefore forfeited his claim.

Babbitt incorrectly says forfeiture rules do not apply.  A defendant's failure to challenge a juror or otherwise object during jury selection forfeits a challenge on appeal.  (*People v. Rangel* (2016) 62 Cal.4th 1192, 1212 [failure to challenge potentially biased juror forfeited the claim].)  Specifically, a defendant forfeits a challenge to a juror's qualifications to serve based on insufficient understanding of English by not raising the issue at trial.  (*People v. Moreno* (2011) 192 Cal.App.4th 692, 705–707 (*Moreno*).)

The *Moreno* court explained the rule.  A contrary approach would allow defendants to keep a potentially incompetent juror and hope for an acquittal while preserving the argument the juror's presence was reversible error.  This forfeiture rule avoids mischievous consequences and promotes finality.  (*Moreno*, *supra*, 192 Cal.App.4th at p. 706.)

Babbitt's appellate briefing ignores these holdings from *Moreno* and *Rangel*. He says Juror No. 9's presence on the jury led to a verdict that was not unanimous. He rests his argument on *People v. Bailey* (2018) 27 Cal.App.5th 376, 385. *Bailey* is different than this case. There, polling of the jury revealed one juror did not find the defendant guilty of a certain count. (*Id.* at pp. 383–384.) Polling here showed all jurors agreed. Babbitt presents no authorities that say a defendant's right to a unanimous jury is implicated when a potentially unqualified juror the defendant failed to challenge at trial remains on the jury.

*People v. Szymanski* (2003) 109 Cal.App.4th 1126 is inapposite. There, an appellate court reversed a judgment due to a juror's insufficient understanding of English. But unlike the present case, the defendant, as well as the People, challenged the juror for cause. (*Id.* at pp. 1128–1129.)

Babbitt forfeited his challenge to Juror No. 9.

### 2

Babbitt has not demonstrated his trial counsel's decisionmaking about Juror No. 9 amounted to ineffective assistance of counsel.

To establish ineffectiveness, a defendant must show counsel's efforts fell below an objective standard of reasonableness. (*Strickland v. Washington* (1984) 466 U.S. 668, 688.) In reviewing ineffective assistance claims, we defer to counsel's reasonable tactical decisions and presume counsel acted within the wide range of reasonable professional assistance. (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).) The use of peremptory challenges is "inherently subjective and intuitive," so an appellate record will rarely disclose ineffective assistance of

9

counsel on this issue.  (*People v. Montiel* (1993) 5 Cal.4th 877, 911, overruled in part on other grounds in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13.)

Typically, claims of ineffective assistance are more appropriately raised in a habeas corpus proceeding.  (*Mai*, *supra*, 57 Cal.4th at p. 1009.)  On direct appeal, we reverse a conviction only if (1) the record shows counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) no satisfactory explanation could exist.  (*Ibid.*)

(Babbitt sets forth ineffectiveness of counsel arguments for several issues, which we address throughout our opinion.  This overview of the law applies to all these sections.)

Babbitt attacks his trial attorney for failing to ask Juror No. 9 more questions and for failing to raise a peremptory or for cause challenge against her.

Babbitt has not demonstrated his trial counsel's inactions had no tactical purpose.  Counsel was attentive to Juror No. 9's exchange with the court and followed up on it.  Counsel asked whether definitions of terms like "beyond a reasonable doubt" would help her.  Counsel could have fairly believed Juror No. 9's response—"I think so"—resolved concerns about the juror's English proficiency.  And counsel may have had other subjective and intuitive reasons to want Juror No. 9 on the jury.  She lived in Los Angeles, was married, was self-employed, and had not been a crime witness or victim.  Some or all of these and other factors may have made counsel believe Juror No. 9 would be a good juror for Babbitt.

Babbitt has not demonstrated his trial counsel was ineffective.

B

The jury sent out a note during deliberations. On appeal, Babbitt challenges the way the court handled this note. Babbitt forfeited this challenge by failing to object. Moreover, Babbitt's counsel's failure to object was not ineffective assistance of counsel. The trial court's actions were proper, so objections would have been futile.

Before addressing Babbitt's claims, we explain about the jury note.

During jury deliberations, the jury sent the court a note asking for Spanish definitions of "attempted murder" and of "attempted manslaughter."

Outside the presence of the jury, the trial court formulated a plan and shared it with counsel. The court would ask the foreperson to "explain the basis of this question." Depending on the outcome of that exchange, the court might question other jurors. The court asked whether anyone objected to this proposal. No one did.

The foreperson explained "two or three" jurors requested the Spanish definitions. The court asked, "Did they indicate they couldn't understand English?" The foreperson answered, "No." The court explained it would be a problem if a juror did not understand English and asked again, "So are people back there saying they don't understand English?" The foreperson responded, "No, that is not what is happening."

The court said, "presumably, everybody understands English" and the court could provide further English definitions upon request. The court would not provide a Spanish definition. The court told the foreperson "people have different degrees of understanding, but they have to be able to communicate with

11

you" and advised the foreperson to let the court know if the jury needed any further help.

Babbitt did not object to any portion of the court's inquiry with the foreperson or to the trial court's response to the jury's request.

1

As with his challenge to Juror No. 9, Babbitt forfeited the jury note challenge by failing to object at trial.

Babbitt again rests on *Bailey* to argue forfeiture rules are inapplicable. This argument fails for the same reasons we already have given. Babbitt cites additional cases about jury unanimity but, as with *Bailey*, none say a defendant's right to a unanimous jury is implicated when a potentially unqualified juror the defendant failed to challenge at trial remains on the jury. (See *Andres v. United States* (1948) 333 U.S. 740; *Smith v. United States* (9th Cir. 1931) 47 F.2d 518; *United States v. Lopez* (9th Cir. 1978) 581 F.2d 1338; *United States v. Smedes* (6th Cir. 1985) 760 F.2d 109.)

Babbitt says the court had an independent duty to inquire about what he calls "jury misconduct," but the court *did* inquire. This inquiry was not an abuse of discretion.

The decision whether to investigate the possibility of juror bias, incompetence, or misconduct is within the trial court's discretion. (*People v. Ray* (1996) 13 Cal.4th 313, 343.)

The court's inquiry was proper. The court asked the foreperson twice about the other jurors' English proficiency. It told the foreperson jurors must understand English and directed the foreperson to tell the court if the jury needed more help. The court could observe and gauge the jurors' facility with English.

All the jurors answered the court's and attorneys' questions in English during voir dire. There was no abuse of discretion.

2

Babbitt has not established that his counsel was ineffective by not objecting to the trial court's handling of the note and by not requesting further inquiry by the court. The record is silent as to why Babbitt's trial counsel decided not to act. As the People point out in their appellate briefing, Babbitt's trial counsel may have believed the trial went well for Babbitt and counsel may have thought there was a good chance the current panel would acquit him. Babbitt has not demonstrated his trial counsel's inactions had no tactical purpose.

III

Babbitt raises arguments about Smith's unavailability and his trial testimony. Babbitt forfeited these arguments by failing to raise any argument or objection at trial. He has not demonstrated his counsel was ineffective.

An investigator for the Los Angeles District Attorney testified about his efforts to locate Smith. After an unsuccessful attempt to meet Smith in March 2019, the investigator met Smith and served him a subpoena at a hospital on April 19, 2019. Smith was in the hospital because someone had "jumped" him the night before and his leg was sore. Smith told the investigator he was homeless and "basically bouncing around from park to park." Smith used public transportation.

Smith met the investigator on May 2, 2019 in the building where the trial took place. A victim service representative gave Smith information about services for victims and an application. Smith seemed cooperative.

The investigator texted Smith on May 7, 2019 to offer Smith a ride to court the next day. The investigator asked Smith where he could pick him up. Smith told the investigator he was in Victorville and "not to worry because he would be in court" the next day.

On May 8, 2019, the investigator waited for Smith at court between 8:30 a.m. and 10:30 a.m. but Smith did not arrive. The investigator unsuccessfully tried to contact Smith "[s]everal times, by calling and by text." A body attachment issued that morning.

The investigator contacted four hospitals and one urgent care facility. Two of the hospitals and the urgent care facility were in Victorville, Smith's stated location the previous evening. The investigator also contacted the hospital where he had met Smith previously.

The investigator did inmate searches for San Bernardino, Riverside, and Los Angeles Counties, and in Clark County, Nevada.

The investigator did not locate Smith.

After the investigator's testimony, the court asked the parties for argument. Babbitt said, "I would submit to the court." The court ruled the People exercised reasonable diligence to get Smith to court and the People demonstrated Smith's unavailability.

Babbitt then said, "I would still object to the prelim transcript coming in, and that's regarding the similarity of motive of the cross-examination that happened with Mr. Smith." Babbitt explained he had an expert enhance a video from the incident after the preliminary hearing. He believed the enhanced

14

video was inconsistent with Smith's statements and Babbitt complained he could not cross-examine Smith on this issue.

The court said it would allow the People to introduce the preliminary hearing transcript. The court explained Babbitt could still play the video and point out inconsistencies between it and Smith's testimony.

After the People introduced Smith's preliminary hearing testimony, Smith arrived at court and he testified without objection from Babbitt.

A

Babbitt did not offer any argument about the prosecution's due diligence at trial. He has forfeited this argument on appeal. (*People v. Tafoya* (2007) 42 Cal.4th 147, 166 [defendant forfeits confrontation clause claim by failing to raise it at trial].) Babbitt preserved a different argument, one he does not raise on appeal, about his motive for cross-examining Smith.

Babbitt did not object when Smith arrived and testified. He did not ask the court to strike the preliminary hearing testimony. He therefore forfeited these arguments, too.

Babbitt incorrectly says the trial court violated its duties under Penal Code section 1044. That section requires courts to limit the introduction of evidence to "relevant and material matters" and to focus on expeditiously obtaining the truth. (*Ibid.*) Babbitt's argument is that Smith's preliminary hearing testimony was cumulative to Smith's trial testimony, and therefore the court had an independent duty to tell the jury to disregard the preliminary hearing testimony entirely. Smith's testimony was relevant and material. The court did not violate its duties.

15

## B

Babbitt has not demonstrated his counsel was ineffective for failing to argue or object about Smith's unavailability and for failing to move to strike the preliminary hearing testimony.

The record is silent on counsel's reasoning.

There may have been a tactical reason for counsel not to object about Smith's unavailability. Babbitt may have believed the prosecution demonstrated reasonable diligence. The investigator offered an accounting of efforts to locate and maintain contact with Smith. Smith was homeless and moved from park to park. He said he would come to court but did not. If Smith did not come voluntarily, it could be difficult or impossible to locate him. Babbitt may have wanted to avoid a losing objection.

Babbitt's trial counsel also may have had a tactical reason not to ask the court to strike Smith's preliminary hearing testimony. As the People point out, Babbitt's counsel may have believed Smith's testimony had inconsistencies that he wished to exploit. By not striking the preliminary testimony, Babbitt could also use that testimony to point to facts in his favor. Indeed, in his closing argument, Babbitt cited the preliminary hearing testimony. For example, he noted that in the preliminary hearing, Smith said he had no long-term complications from the shooting. Counsel also cited the preliminary hearing testimony to cast doubt on Smith's actions when he returned to the dispensary a second time.

Babbitt has not shown his counsel was ineffective regarding Smith's testimony.

## IV

Sufficient evidence supported Babbitt's gang enhancement.

16

To support a true finding on a section 186.22, subdivision (b) gang enhancement, the prosecution must prove (1) the defendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang, and (2) the defendant intended to promote, further, or assist criminal conduct by gang members. (*People v. Albillar* (2010) 51 Cal.4th 47, 59 (*Albillar*).)

We review the record in the light most favorable to the judgment to determine whether it contains substantial evidence. (*Albillar*, *supra*, 51 Cal.4th at pp. 59–60.) We affirm unless no substantial evidence supports the verdict on any hypothesis. (See *People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Expert opinion can support a gang enhancement under section 186.22, subdivision (b)(1). (*People v. Vang* (2011) 52 Cal.4th 1038, 1048 (*Vang*).)

The gang expert, Clark, monitored the Five-Deuce Hoovers. The gang's primary activities include homicides, assaults with deadly weapons, and various types of shootings.

Clark believed Babbitt was in the Five-Deuce Hoovers based on a photograph of Babbitt making a Five-Deuce Hoovers hand symbol, taped jail calls in which Babbitt introduced himself as being "from Hoover" and said he wanted to talk to someone from "five deuce," and the circumstances of the alleged crime.

The gang's territory includes the corner of Figueroa and Slauson. The marijuana dispensary at that corner was a common hangout for members. In Clark's experience, gang members who frequently hang out at a marijuana dispensary are protective or territorial about the dispensary. "[T]hey don't want other people to pass through freely, they want to have control over that."

17

Clark explained the question "Where you from?" means "What gang do you claim?"  Gang members use the question to identify allies and rivals.  If a person says they are not in a gang, gang members might still see the person as a "potential target."  If a person remains in gang territory after gang members ask where the person is from, that could show the person does not respect or fear the gang.  Pulling a knife and chasing gang members would also show disrespect for the gang.

The People offered a hypothetical tracking many of the facts of Babbitt's case.  Clark said the hypothetical scenario would benefit the gang for several reasons.

The violent and public nature of the act would increase the gang's reputation for violence.  It would show everyone that the gang would defend its territory.  People could not travel through the area "unchecked."

Furthermore, the shooting would intimidate the community and deter witnesses from reporting crimes and speaking with police, thus giving the gang more latitude for criminal activity.  The shooting would also boost the shooter's gang status.

Babbitt's appellate briefing does not dispute he was a member of the gang.

The testimony of Clark and Smith provided sufficient evidence Babbitt's shooting was for the benefit of his gang and that Babbitt intended to benefit his gang.

Clark's testimony demonstrated the shooting took place in territory the gang claimed.  Specifically, it was in front of a dispensary gang members frequented.  Indeed, the officer who arrested Babbitt found him and arrested him outside that dispensary two weeks after the shooting.

Babbitt's statements showed his gang motivated him. According to Smith, Babbitt asked, "Where you from?" This question was designed to determine whether Smith was a gang ally or a potential gang threat. Smith also testified that Babbitt and the two other men warned Smith he was in "Hoover area." Babbitt told Smith Babbitt was "from Hoover." This showed Smith's presence and actions within gang territory motivated Babbitt to shoot.

Smith's chase and the shooting were in public view. Aside from Babbitt and his two companions, others were in the area. One remembered Smith's initial chase, remarking "He's back. He came back" when Smith returned.

The jury could reasonably infer Smith's public chase of Babbitt in gang territory and his return to that territory threatened the reputation of the Five-Deuce Hoovers. It could reasonably infer Babbitt's retaliatory shooting was for the benefit of his gang and that Babbitt intended to benefit the gang.

Babbitt says the prosecution's hypothetical was based on the "prosecutor's view of the facts," but the record provides factual support for the hypothetical's propositions. Contrary to Babbitt's claim, the hypothetical did not ask Clark to "assume" Babbitt and the two other people acted together to commit attempted murder. If anything, the hypothetical favored Babbitt because it excluded the shooter's statement to the victim that the shooter was from Hoover, even though Smith testified Babbitt said he was from Hoover.

Sufficient evidence supported the gang enhancement.

V

Babbitt challenges his $40 court operations assessment and his $30 criminal conviction assessment under *People v. Dueñas*

19

(2019) 30 Cal.App.5th 1157, but he forfeited these challenges by failing to object at trial.  (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153–1155.)  He also states his counsel was "ineffective for failing to object" but provides no argument on this issue, which he thereby forfeits.

VI

Babbitt's abstract of judgment incorrectly says he was convicted by a plea.  We remand with a limited instruction for the trial court to correct this error.

**DISPOSITION**

We remand with directions for the court to amend the abstract of judgment to reflect Babbitt was convicted by a jury and to forward a certified copy to the Department of Corrections and Rehabilitation.  The judgment is otherwise affirmed.


WILEY, J.


We concur:


BIGELOW, P. J.


GRIMES, J.


20