Filed 4/24/14  P. v. Richie CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JIMMY WAYNE RICHIE et al.,<br><br>    Defendants and Appellants. | F065073 & F065207<br><br>(Super. Ct. Nos. AF008717A & AF008717B)<br><br>**OPINION** |

APPEALS from a judgment of the Superior Court of Kern County.  Colette M. Humphrey and Eric Bradshaw, Judges.

Peter Dodd, under appointment by the Court of Appeal, for Defendant and Appellant Jimmy Wayne Richie.

Gregory Marshall, under appointment by the Court of Appeal, for Defendant and Appellant Robert Edward Vanderhyde, Jr.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Kevin L. Quade, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendants Jimmy Wayne Richie and Robert Edward Vanderhyde, Jr., were convicted of possessing methamphetamine for sale (Health & Saf. Code, § 11378) and cultivation of marijuana (*id.*, § 11358) following a jury trial. In a bifurcated proceeding, the jury found true the allegation Richie suffered four prior prison terms within the meaning of Penal Code[1] section 667.5, subdivision (b). The trial court found true the allegation Vanderhyde also suffered a prior prison term.

The trial court sentenced Richie to a total term of four years' custody pursuant to section 1170, subdivision (h), with an additional three years to be served on mandatory supervision. Vanderhyde was sentenced to two years in custody pursuant to section 1170, subdivision (h), with an additional two years to be served on mandatory supervision.

On appeal Richie contends (1) the trial court erred in denying his suppression motion, (2) the court improperly instructed the jury with the flight instruction, (3) evidence he invoked a constitutional right was improperly admitted against him, (4) improper character evidence was admitted against him, (5) the trial court erred in imposing an accounts receivable fine, and (6) the admission of documents to prove his prior convictions violated his right to confront and cross-examine witnesses against him. Without any attempt to apply them to his case, Vanderhyde joins in "any and all arguments" made by Richie and further argues the evidence was insufficient to support his marijuana cultivation conviction. We will reduce defendants' accounts receivable fee to $30, and reject defendants' remaining arguments.

**FACTS**

On May 13, 2011, police officers served a search warrant on 1417 Bush Street. While serving the search warrant, officers encountered a small house located at the back of the property. Officers knocked on the door to the back house—later determined to be 1417 1/2 Bush Street—announced they had a search warrant, and attempted to enter.

---

[1]All further references are to the Penal Code unless otherwise indicated.

2.

According to Officer William Funderburk, their entry was hindered by someone holding the door closed. However, Officer Jose Vazquez, the first officer to make entry, testified the deadbolt and doorknob were locked and he could not determine if someone was holding the door closed. Officers were able to force the door open by hitting it repeatedly with their body weight. It took approximately 30 seconds for the officers to gain entry. Upon entry, officers discovered Richie standing directly in front of the door. Vanderhyde was lying on the floor next to a computer table.

Officers immediately noticed a surveillance monitor showing a live picture of the area just outside of the front door. The officers subsequently conducted a search of the small one-bedroom residence and discovered a pill bottle with baggies of suspected methamphetamine inside, a cup containing numerous pieces of plastic cut into approximately one-inch squares, and marijuana, some packaged and some loose, on the computer table. In a storage compartment of the table, officers found a notebook with names and dollar amounts, consistent with a pay/owe sheet, four digital scales, some with a white residue on top, and ziplock bags. There were also numerous documents addressed to Richie on the desk. A basket on top of the table held two glass pipes used for smoking methamphetamine with white residue. Another methamphetamine smoking pipe was found in an ashtray next to the bed. A billy club was found underneath the desk.

In the pocket of a pair of pants located on the floor next to Vanderhyde, officers found two baggies containing suspected methamphetamine in two separate pockets of the pants, as well as $50. A wallet containing Richie's identification was also located in another pocket of the pants. The wallet contained two EBT (electronic benefits transfer) cards, neither of which bore the name of either defendant.

Officers also located a police scanner in the room next to a notepad containing codes and the names of various police agencies. Officer Funderburk turned on the scanner and heard some of his police colleagues on the radio. While conducting the search, a cellular telephone located on the desk rang several times. Funderburk answered

3.

the phone on one occasion and the caller asked for "Jimmy." A search of the phone's text messages revealed a message sent at 1:27 a.m. that morning from "David" stating he could "use another 20."

Outside of the back house, officers found seven potted marijuana plants. There was also fresh soil along the east wall of the back house. A search of Vanderhyde's wallet revealed a paper with instructions for growing marijuana apparently using an indoor system. Vanderhyde also had an EBT card in his wallet belonging to someone else and $56 in cash.

Officers spoke to Vanderhyde after he was provided with his rights under *Miranda v. Arizona* (1966) 384 U.S. 436. Vanderhyde stated "all the dope" the officers found belonged to him. Specifically he stated there was an "eight ball" in his jeans and a "teener" on the desk. An "eight ball" is an eighth of an ounce or 3.5 grams of methamphetamine, while a "teener" represents a sixteenth of an ounce or 1.7 grams of the drug. A red motorcycle was found on the property. Vanderhyde stated the motorcycle was his and he had traded a fourth of an ounce of methamphetamine for it.

Apryl Brown, a criminalist, tested the suspected methamphetamine recovered by the officers. She tested three of the four baggies of substance submitted and determined they contained methamphetamine. The net weight of the baggies she tested was 10.94 grams.

Sergeant Jonathan Swanson testified as an expert regarding narcotics and narcotics sales. A common way to use methamphetamine is by smoking it with a glass pipe. Several items often associated with narcotics sales include scales, cellular telephones, surveillance cameras, scanners, weapons, money, packaging materials, and pay/owe sheets. Narcotics dealers often use surveillance systems and scanners to warn them of police presence. It is also common for people to trade things, such as EBT cards, for drugs. Often methamphetamine users will sell the drug to support their habit. This is done by buying a large quantity of a drug and then repackaging it in smaller quantities and selling it at a profit. A message asking for a "20" also indicates sales, in that a "20"

refers to an amount of drugs. One of the baggies of methamphetamine recovered from the house weighed 0.16 grams, which is consistent with a "20."

Regarding methamphetamine use, Swanson testified a typical user will use anywhere between 0.1 to 0.25 grams of methamphetamine at a time. A new user commonly uses 0.1 grams a few times per week. A heavy user could use between 0.1 and 0.25 grams two to three times per day. Swanson was aware of the amount of methamphetamine found here, 10.94 grams. In his experience, people possessing methamphetamine solely for personal use possess much smaller amounts. The amount found comprised approximately 110 uses.

In his opinion, the methamphetamine was possessed for sales. Swanson based his opinion on a combination of factors including the large amount of methamphetamine found, the packaging material, the presence of a billy club, the scales with residue, and the presence of surveillance equipment as well as a scanner. Further, the presence of the EBT cards and the cell phone message further supported his opinion, as the message indicated sales, and people often trade EBT cards for drugs.

### Defense Case

Vanderhyde testified in his own defense. Vanderhyde admitted he is a methamphetamine user, using a gram to a gram and a half per day. He stated the methamphetamine found in the search belonged to him. He denied selling methamphetamine.

On the day in question, Vanderhyde was staying with Richie at his home because he had injured his leg and could not move around on his own. Richie had offered to let him stay with him and provided someone to cook him meals. The monitor for the surveillance camera was always on and was present when he began staying there a few weeks earlier. The monitor was very noticeable in the room.

Regarding the search of the home, Vanderhyde testified he woke up when the police officers arrived at the door of the home. He had been asleep on the floor and immediately grabbed his drugs and put them into the pocket of some pants. He thought

the pants were his but they belonged to Richie. When he heard the noise, he could see the police officers on the surveillance monitor. All the methamphetamine the officers found belonged to him. The marijuana was also his.

Vanderhyde's practice is to buy an ounce of methamphetamine, which equals approximately 28 grams, once a month and then divide it into smaller packages. He weighed his methamphetamine into individual doses using a scale. Vanderhyde testified he does this so the methamphetamine will last him through the month. If he does not divide the methamphetamine in such a manner and leaves it in one large container, it will not last him through the entire month. He had bought the methamphetamine prior to staying with Richie but had not yet divided it into smaller amounts because he was hiding his methamphetamine from Richie. He meant to divide the drugs the night before the search, but took some pain medication and could not complete the process.

Regarding the scales found during the search, Vanderhyde testified he only possessed a single scale, and the four scales found in the desk were not his. The scanner found in the house was also his, although it was not working at the time. He had written down the codes next to the scanner.

Vanderhyde denied ever telling the officers he traded methamphetamine for the motorcycle found outside the residence. Vanderhyde never smoked methamphetamine with Richie nor did he ever see him use methamphetamine. The marijuana on the desk was his. He sometimes saved marijuana seeds and had been thinking about cultivating marijuana but had not done so; the marijuana plants found at the residence were not his. Regarding the marijuana growing instructions found in his wallet, he claimed it was for an indoor hydroponic system, not for an outdoor growing operation. He had not seen the marijuana growing outside of the house but noted the area was accessible to people from both the front and the back houses.

Vanderhyde admitted to a prior conviction for theft in 2005.

## DISCUSSION

### I.     The Trial Court Properly Denied the Suppression Motion

Defendants[2] claim the trial court improperly denied their motion to suppress the evidence discovered at 1417 1/2 Bush Street. They claim the original warrant did not encompass the back house as it could not be considered an "outbuilding" of the front house. Additionally, they argue, the trial court's ruling that the officer reasonably concluded the back house was an outbuilding is unsupported by the record. Further, they argue the officers' entry into the back house was unreasonable, and the subsequent warrant which was obtained for the back house was based upon observations that were made illegally. We find the initial warrant was properly executed.

### *Background*

Officer Funderburk obtained the initial warrant to search the residence located at 1417 Bush Street. The warrant listed Richie as a person to be searched and included as relevant here, "any garages, storage rooms, trash containers, and outbuildings of any kind located thereon." The warrant was based upon a controlled narcotics buy with a confidential informant. The transaction took place at 1417 Bush Street, and Richie was identified as the seller. According to the affidavit in support of the warrant, Funderburk conducted a record check of vehicles located at the residence and discovered one was registered to Richie. Funderburk opined that Richie resided at 1417 Bush Street based upon a search of Department of Motor Vehicles (DMV) records, as well as the fact that Richie used the address for his Health and Safety Code section 11590 narcotics registration.

At the hearing on the motion to suppress, Funderburk testified they executed the warrant at approximately 6:34 a.m. The property consisted of a front house facing the street with a mailbox denoting the address as 1417. Approximately 50 feet behind the

---

[2]As Vanderhyde failed to make any specific arguments regarding the issues raised by Richie as related to him, we will not address any arguments that might be unique to Vanderhyde. (*People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11.)

house was a small structure, consisting of one room, on the southeast portion of the property. The area between the front house and back structure was composed of dirt and had various vehicles parked on it. Both buildings were painted the same color, and there was no obstruction between the front and back buildings, although there was a fence on the west side of the property that would prevent someone on the street from entering the back structure. There were no markings on the back house to indicate it had a different address and there was only one mailbox on the property.

When the officers served the warrant, they announced their presence at the front house and entered through the open front door. Upon entering, officers detained the occupants, Virginia Richie and her adult daughter. Ms. Richie was asked where Richie was located, and she indicated he was in the back building. At that point, officers approached the back building. The back building contained a single door and window, however, officers could not see inside. Officers knocked on the door and announced their presence, stated they had a search warrant, and attempted to enter. They were met with some resistance at the door, however, they were able to make entry and detain both defendants inside. Upon entering the back building it was apparent the structure was being used as a residence; it consisted of a single bedroom, kitchen area, and a bathroom. While detaining defendants, Funderburk observed in plain sight a pill bottle containing a clear plastic baggie with a crystalline substance inside resembling methamphetamine.

After detaining defendants, the officers escorted all the occupants from the two houses to the common backyard area and informed them they were going to begin the search. At that point, one of the occupants informed the officers that the back building where defendants were detained had a separate address of 1417 1/2 Bush Street. Officers could not locate any identifying marks on the back building indicating it was a separate address, however, Funderburk decided to get a second search warrant to cover the back address before conducting the search. While obtaining the warrant, officers "froze" the back building, securing the exterior. In applying for the second search warrant, Funderburk repeated the facts contained in the first affidavit, adding only that during the

8.

execution of the first search warrant, officers learned Richie lived in a detached residence at 1417 1/2 Bush Street just to the south of 1417 Bush Street and that Funderburk had observed the suspected methamphetamine in the medicine bottle in plain sight upon detaining defendants. Funderburk received the second search warrant approximately two hours after serving the first search warrant. Officers later confirmed the back house in fact had a separate address of 1417 1/2 Bush Street.

Upon searching the back residence, officers found, as relevant here, several letters addressed to Richie bearing the 1417 Bush Street address. Funderburk also indicated he had conducted a DMV records check for Richie listing his address as 1417 Bush Street. Additionally, defendant's vehicle was registered to the same address.

Defendants moved to suppress the evidence found in the back residence. The People opposed the motion, arguing, in part, that the first search warrant, which included a provision to search all outbuildings on the premises, was valid for the search of the back building. Further, the People argued, the back house "is not a separate address and merely an outbuilding located thereon the premises of 1417 Bush Street as described in the first search warrant." In arguing the motion to suppress, Richie argued "the search of the back residence was beyond the scope of the search warrant. The search warrant states 1417 Bush Street, it does not state 1417 and a half Bush Street." He further argued the officers knew the back residence was on the premises although admitted the officers did not know it had a different address. He concluded his argument as follows:

> "Your Honor, I would contend it doesn't matter whether or not that officer knew it had a separate mailing address or separate number of the city's register or whatever it is that the building inspector would be talking about, it's a separate residence. A separate residence. And it cannot be called an outbuilding. It's a residence and it's a separate residence and that is not named in the search warrant. It is not included as a outbuilding because it is its own separate residence."

Vanderhyde followed up on this argument, stating the testimony established the officers entered the back residence after learning it had a separate address. The trial court pointed out the assertion was incorrect, noting the court had clarified that issue during the

9.

hearing, asking the officer at what point specifically he learned the back residence had a separate address. The court noted the officer testified he only learned the back residence possibly had a different address after they removed the two defendants.

After asking the prosecutor if he wanted "to submit [the issue] on your papers?" and receiving an affirmative response, the trial court ruled on the motion as follows:

> "First of all, with regard to the officer's actions in entering the back residence, I think it does matter when they knew it had a separate address … because the search warrant allowed them to search the front residence and all outbuildings, and I don't know if even your client knew it was a separate residence, because his driver's license and vehicle were registered to 1417 Bush Street, not 1417 and a half Bush Street, there were no numbers on the building to indicate it was a separate residence.

> "As soon as the officer received information that it was a separate residence, the first thing he did was freeze the scene and obtain a second search warrant. To me, that indicates an officer who's acting in good faith. And when he entered the residence, he had a reasonable belief it's an outbuilding, not a residence. And as soon as he found out it was a separate address, he did the right thing: he froze the scene and obtained a search warrant."

### Forfeiture

Initially, we address defendants' contention the People forfeited the argument that officers properly entered the back building under the mistaken belief it was covered in the initial warrant. In the opening brief, defendants note one "of the issues on which the trial court focused was that the initial search warrant authorized the search of 1417 Bush and all 'outbuildings'. However the record does not support a finding that the police could reasonably decide that 1417 1/2 Bush was an outbuilding." Plaintiff counters "that exclusion was not warranted because the police entry was made under a reasonable, albeit, mistaken belief that Richie's residence was within the scope of the initial warrant." In reply defendants argue "this justification was not presented at trial, and thus may not be raised for the first time on appeal." We disagree.

As recounted above, the People argued, at least briefly, in their opposition to defendants' motion, that the officers' entry into the back residence was supported by the

10.

warrant. Indeed, defendants argued against this theory at the motion to suppress, and the trial court expressly ruled the officers' entry into the back residence was based upon a reasonable belief it was an outbuilding as described in the warrant. Thus it appears the issue was in fact raised in the trial court.

This conclusion is further supported by the fact the prosecutor questioned the officer extensively regarding the outward appearance of the back house, whether it had any separate markings indicating a separate address, whether the back and main residence were painted in a similar manner, whether there were any obstructions between the main house and the back house, and when the officer had received the information the back building had a separate address. Richie also cross-examined the officer on the issue, asking whether he knew the back building existed before he served the initial search warrant, when he learned from the building inspector that the back building indeed had a separate address, and whether the officers announced a search warrant when they initially entered the back residence. Vanderhyde also followed up regarding when the building inspector was called to determine a separate address of the back residence, and whether the officer knew at the time he initially entered the back residence that it had a different address.

Furthermore, Richie called a witness at the suppression hearing to describe the interior of the back residence to establish that, upon entry, one would conclude the building was in fact a dwelling. The witness testified the building contained a kitchen, a bathroom, and a room with a bed, and Richie lived in the building.

Although a reviewing court may decide the merits of an alternate theory not presented by the parties below, our Supreme Court has cautioned appellate courts from considering for the first time on review a new theory to support a search or seizure where "'the People's new theory was not supported by the record made at the first hearing and would have necessitated the taking of considerably more evidence, …' or when 'the defendant had no notice of the new theory and thus no opportunity to present evidence in opposition.'" (*Robey v. Superior Court* (2013) 56 Cal.4th 1218, 1242, quoting *Green v.*

*Superior Court* (1985) 40 Cal.3d 126, 137-138; see *Mestas v. Superior Court* (1972) 7 Cal.3d 537, 542 [prohibiting use of new justification at appellate level to support search where prosecution failed to make factual record in trial court demonstrating officer acted upon that justification]; *Lorenzana v. Superior Court* (1973) 9 Cal.3d 626, 640-641 [People prevented from presenting new theory on appeal that would necessitate development of additional evidence]; *Giordenello v. United States* (1958) 357 U.S. 480, 487-488 [government prevented from asserting new justification on appeal for arrest where defendant had no notice of the theory at trial level and therefore no opportunity to develop facts undermining the theory].)

In *Green v. Superior Court*, our Supreme Court explained that where the theory forwarded on appeal was fully developed in the trial court, despite a mere passing reference of the theory in the trial court, failing to consider the "clear applicability" of the theory on review would "run contrary to the settled principle of appellate review that a correct decision of the trial court must be affirmed on appeal even if based on erroneous reasoning." (*Green v. Superior Court*, *supra*, 40 Cal.3d at p. 138.) Here, as recounted above, the facts relating to whether the officers reasonably believed the back residence was an outbuilding were fully developed in the trial court. Furthermore, as recounted above, it is likewise clear defendants had notice of this theory in the trial court and it was in fact the basis of the trial court's ruling. We will, therefore, proceed to the merits.

*Legal Analysis*

In reviewing a trial court's ruling on a motion to suppress, we defer to the court's factual findings where they are supported by substantial evidence. (*People v. Glaser* (1995) 11 Cal.4th 354, 362.) However, this court uses its independent judgment in determining whether, in light of the facts as found by the trial court, the search or seizure was reasonable under the Fourth Amendment. (*Ibid*.) The trial court found the officer had a reasonable belief at the time they entered the back house it was an outbuilding covered by the initial warrant. We agree.

12.

Defendants argue the officer's entry into the back house exceeded the scope of the warrant and was not justified by any exigent circumstances. A warrant to search a single dwelling unit will also permit the search of outbuildings, but does not extend to the search of multiple dwellings on the same property without probable cause to search each dwelling or a reasonable basis for believing the entire premises is a single living unit. (*People v. Estrada* (1965) 234 Cal.App.2d 136, 146.) The initial warrant expressly included all outbuildings associated with 1417 Bush Street. The crux of defendants' argument is that because the back house was in fact a dwelling, the officers' entry into the back house was necessarily invalid. However, defendants fail to recognize the constitutionality of the officers' execution of a search warrant is assessed "in light of the information available to them at the time they acted." (*Maryland v. Garrison* (1987) 480 U.S. 79, 85 (*Garrison*).) When we consider the officers' entry into the back house based upon the information they had at the time, it becomes clear the entry was valid under the initial warrant. (*Ibid*.)

In *Garrison*, officers obtained a warrant for Lawrence McWebb and the third floor apartment of a specific address. At the time of the search, officers believed the third floor contained a single apartment. However, the third floor actually contained two apartments, one belonging to McWebb and the other belonging to Garrison. When serving the warrant, officers encountered McWebb outside of the apartment building. They used his key to enter the building and proceeded to the third floor where they encountered Garrison standing in the hallway area. Officers could see into both apartments, as both doors were open. Officers entered and began searching and discovered the floor actually contained two separate apartments, and the various items of contraband found were found in Garrison's apartment. Officers discontinued their search of Garrison's apartment upon learning the apartment they entered actually belonged to Garrison. The trial court found the officers reasonably believed they were searching McWebb's apartment. (*Garrison*, *supra*, 480 U.S. at pp 80-81.)

13.

In upholding the validity of the search, the Supreme Court first determined the warrant was valid at the time it was issued despite the subsequent discovery the warrant was overbroad.  (*Garrison*, *supra*, 480 U.S. at p. 85.)  The court determined that in assessing the validity of the warrant, the court must consider the information available to the officers at the time they acted.  (*Ibid*.)

Next, the court considered whether the execution of the warrant violated Garrison's Fourth Amendment right to be free from unreasonable searches.  The court noted:  "If the officers had known, or should have known, that the third floor contained two apartments before they entered the living quarters on the third floor, and thus had been aware of the error in the warrant, they would have been obligated to limit their search to McWebb's apartment."  (*Garrison*, *supra*, 480 U.S. at p. 86.)  However, the court concluded the "officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable."  (*Id*. at p. 88.)  This was because the "objective facts available to the officers at the time suggested no distinction between McWebb's apartment and the third-floor premises."  (*Ibid*.)

Likewise here, the trial court determined the officers reasonably believed the detached residence in the back was an outbuilding covered by the warrant.  Substantial evidence supports that finding.  The evidence established the two dwellings occupied a single plot of land, the two buildings shared a common yard, and there were no obstructions preventing entry between the front and back houses.  The two houses were described as having identical color schemes and roofing.  There was a single mailbox on the front of the property bearing the 1417 address.  There were no markings on the back building to indicate it had a separate address.  When officers executed the warrant, they were told by Virginia Richie that Richie was in the back building.  Importantly, they were not told at that time the back building bore a separate address.  Indeed, all the information the officers possessed at the time suggested the two buildings bore the same address, as defendant's narcotics registration and the DMV records both indicated he lived at the 1417 address.

14.

The back building had a single door and window, however, officers could not see into the building before they made entry. While substantial evidence was offered to demonstrate that, upon entry, it was apparent the back building was a dwelling, no evidence suggested the officers could make that determination solely from an observation of the exterior. Officers knocked and announced their presence, declaring they had a search warrant for the premises, which indicated they believed the warrant in fact encompassed the back building. Once they entered and detained defendants, it was apparent the back building was a dwelling. Upon learning it also may have a separate address; the officers simply froze the residence and applied for a second search warrant. It is important to note the officers did not search the back building until they obtained the second warrant. While the officers did observe the suspected methamphetamine upon entry of the back building, it appears undisputed the contraband was in plain sight. (*Horton v. California* (1990) 496 U.S. 128, 133 ["If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy"].) As such, the observation of the suspected methamphetamine was properly placed in the affidavit.

Considering the court's factual findings here, we agree the officers' actions in executing the initial search warrant was reasonable in light of the information they possessed at the time. (*Garrison*, *supra*, 480 U.S. at pp. 86-88.) As such, the officers' entry into the back house was valid and defendants' motion was properly denied.

## II. Instructing the Jury With the Flight Instruction Was Proper

Richie argues the trial court improperly instructed the jury with a modified flight instruction because there was no evidence he took actions to avoid arrest immediately after any crime. He further argues the modified CALCRIM No. 372 constituted an improper pinpoint instruction. We find no error.

At trial, the jury was instructed as follows:

"If the defendant fled or tried to flee immediately after the crime was committed or after he was accused of committing the crime, that conduct may show that he was aware of his guilt.

15.

"If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct; however, evidence that the defendant fled or tried to flee cannot prove guilt by itself.

"For purposes of this instruction, flight does not require that a person run from the scene or make an escape. What is required is acting for the purpose of avoiding observation or arrest."

Pursuant to section 1127c, a trial court is required to instruct the jury, in language similar to CALCRIM No. 372, regarding flight where evidence of flight is relied upon as evidence tending to demonstrate a defendant's guilt. In arguing the instruction was not warranted here, Richie claims there was no evidence he fled "immediately after" the commission of a crime, nor was there evidence he knew he had been accused of a crime. Richie's argument is misplaced as CALCRIM No. 372 "neither requires knowledge on a defendant's part that criminal charges have been filed, nor a defined temporal period within which the flight must be commenced, nor resistance upon arrest." (*People v. Carter* (2005) 36 Cal.4th 1114, 1182.) In *Carter*, our Supreme Court found the flight instruction was plainly warranted where the defendant left the state in the days following the offenses and was in possession of a murder victim's vehicle when subsequently arrested in another state. (*Id*. at p. 1182.) A flight instruction is proper when the defendant's actions "logically permit[] an inference that his movement was motivated by guilty knowledge." (*People v. Turner* (1990) 50 Cal.3d 668, 694; see *People v. Visciotti* (1992) 2 Cal.4th 1, 60 [flight requires a purpose to avoid being observed or arrested].)

Here the evidence amply supports the flight instruction. Richie possessed methamphetamine, in plain sight, in the back house, and the jury found he possessed the drugs with the intent to sell them. Funderburk testified that before entering the back house, an officer yelled "Police, search warrant, open the door." This announcement was made several times in both English and Spanish. Further, a surveillance monitor showing who was at the front door was on inside the house. Officers attempted to enter, but, according to Funderburk, someone was holding the door closed. After a brief struggle, officers were able to make entry and saw Richie standing directly in front of the door.

16.

The only other person in the back house was Vanderhyde, who was lying on the floor near a computer table.  From this evidence, the jury could have concluded Richie, knowing he possessed a quantity of methamphetamine and knowing the police were at his door with a search warrant, held the door closed in an attempt to avoid detection or arrest for his crimes.  As such, the instruction was proper.

We likewise reject Richie's argument, relying on *People v. Wright* (1988) 45 Cal.3d 1126, that CALCRIM No. 372 constituted an improper pinpoint instruction. Richie omits from his argument a citation to any of the California Supreme Court cases rejecting this very argument.  As our Supreme Court has noted, the argument that the flight instruction is an "impermissibly argumentative pinpoint instruction[] that allow[s] juries to draw improper inferences of guilt … has been repeatedly rejected."  (*People v. McWhorter* (2009) 47 Cal.4th 318, 377 [addressing predecessor CALJIC No. 2.52 flight instruction]; cf. *People v. Taylor* (2010) 48 Cal.4th 574, 630 [declining invitation to reconsider whether CALJIC No. 2.25 consciousness of guilt instruction is impermissibly argumentative]; *People v. Avila* (2009) 46 Cal.4th 680, 710 ["flight instruction does not create an unconstitutional permissive inference or lessen the prosecutor's burden of proof, and is proper"]; *People v. Mendoza* (2000) 24 Cal.4th 130, 180-181 [rejecting arguments that CALJIC No. 2.52 flight instruction is improper pinpoint instruction and impermissibly argumentative].)  We are of course bound to follow our high court's firmly established precedent in this regard, thus we likewise reject Richie's claim.  (*Auto Equity Sales*, *Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Even if we were to agree that instructing the jury with CALCRIM No. 372 was error, as our Supreme Court has repeatedly held, the giving of the instruction would be harmless as the "instruction did not assume that flight was established, leaving that factual determination and its significance to the jury."  (*People v. Visciotti* , *supra*, 2 Cal.4th at p. 61; see *People v. Carter*, *supra*, 36 Cal.4th at pp. 1182-1183.)  Here there was conflicting evidence regarding whether Richie was holding the door closed, and defense counsel argued the evidence did not establish he was preventing the officers'

17.

entry. If, as Richie contends, there was insufficient evidence of flight, the instruction, by its own terms, had no application for the jury.

Moreover, where a trial court gives a legally correct but inapplicable instruction, the error "'is usually harmless, having little or no effect "other than to add to the bulk of the charge."' [Citation.]" (*People v. Lee* (1990) 219 Cal.App.3d 829, 841; cf. *People v. Visciotti*, *supra*, 2 Cal.4th at p. 61 [even if flight instruction should not have been given, it was "clearly harmless"].)

Furthermore, as discussed *post*, the evidence of guilt against Richie was compelling, such that any error was clearly harmless.

## III. Defendant Forfeited Any Error in the Admission of Evidence that He Invoked His Fourth Amendment Rights

In a related argument, Richie contends the trial court erred by permitting evidence that he invoked his Fourth Amendment right to be free from unreasonable search. Plaintiff argues the claim was forfeited due to Richie's failure to object on that ground in the trial court. We agree.

Prior to trial, Richie sought to exclude evidence regarding "any defendant blocking or hindering officers from entering a residence." He did not state in his moving papers on what basis he sought to exclude this evidence. In arguing the in limine motions, the prosecutor initially explained the evidence was sought as indicative of consciousness of guilt. When asked why the evidence should be excluded, Richie argued:

> "A person trying to hinder somebody from entering their home, that's—I would contend that does not show consciousness of guilt. That goes to the—to the—again, a fundamental right to—of people to protect their homes from entry by strangers. And any natural person would try to keep strangers from entering their home. It doesn't necessarily mean that there's any illegal activity going on inside of the home or that a person is trying— that it reflects upon consciousness of guilt. And therefore, it's—it's—I would contend that it's not relevant to the charges in this case."

Subsequently the prosecutor informed the court of the circumstances of the entry, namely, the officers identified themselves as police and stated they had a search warrant.

18.

The prosecutor further explained there was a surveillance monitor inside the residence that showed the officers at the front door. When asked to respond, Richie argued again that the evidence did not demonstrate consciousness of guilt and objected that the evidence was irrelevant. The trial court denied Richie's motion to exclude. At trial, there was no objection to the evidence that someone held the door closed as the officers attempted to enter pursuant to the warrant. The only objection to this line of inquiry related to who was holding the door closed. Those objections were based solely on the grounds of a lack of foundation, and once a sufficient foundation was provided, the evidence was introduced without objection.

It is well settled "'that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal.'" (*People v. Raley* (1992) 2 Cal.4th 870, 892, quoting *People v. Rogers* (1978) 21 Cal.3d 542, 548.) While Richie objected to the introduction of the evidence, he never argued the admission of the evidence implicated his Fourth Amendment rights. His sole objection was the evidence was irrelevant as it did not establish consciousness of guilt. As the issue was not raised in the trial court, it has been forfeited on appeal.

Perhaps anticipating this ruling, Richie argues his counsel's failure to raise the issue in the trial court constituted ineffective assistance of counsel. "Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) To establish ineffective assistance of counsel, "'a defendant must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to defendant ….'" (*People v. Lewis* (2001) 25 Cal.4th 610, 674.)

Richie fails to show how defense counsel's omission fell below the prevailing professional norms under an objective standard of reasonableness. (*People v. Ledesma*,

19.

*supra*, 43 Cal.3d at p. 216.)  As previously noted, the trial court had correctly ruled there was no Fourth Amendment violation in the officers' entry into Richie's home as they had a search warrant they could reasonably rely upon for that entry.  An argument Richie could prevent their entry based on his right to be free of unreasonable searches would have been futile under the circumstances.

In any event, as discussed *post*, the evidence of Richie's guilt was compelling.  He cannot meet his burden to show counsel's alleged deficient performance resulted in prejudice to his case.  (*People v. Lewis*, *supra*, 25 Cal.4th at p. 674.)

## IV.     The Admission of Any Improper Character Evidence Was Harmless

At trial, Vanderhyde testified in his own defense.  During direct examination, Vanderhyde testified Richie "offered his home" for Vanderhyde to stay in while he recovered from an accident.  While there, someone cooked for him while he recovered. During cross-examination, the prosecutor asked Vanderhyde if Richie was "nice enough to offer you his residence because you were injured."  Vanderhyde stated that was correct and volunteered that Richie also offered him the use of his bed.

When the prosecutor asked Vanderhyde whether he considered Richie a good friend, Vanderhyde responded, "Yeah, he is like a real good person."  Subsequently, Richie's counsel asked several questions relating to how Vanderhyde got his injury and elicited the fact Richie took him to the hospital and picked him up.  He had Vanderhyde show the jury the scar from his injury.  Further, he elicited the fact Richie offered to let him stay in his home and that he used Richie's bed.  Vanderhyde offered that he had to convince Richie to take his bed back after 10 days and he started sleeping on the floor.

After Richie's counsel questioned Vanderhyde, the prosecutor sought to introduce evidence Richie suffered two prior misdemeanor convictions of moral turpitude in an attempt to rebut the evidence of Richie's good character.  The prosecutor argued Vanderhyde testified to Richie's good character as follows:  (1) Richie was a "good person"; (2) Richie offered to let Vanderhyde stay with him; (3) Richie cared for Vanderhyde; and (4) Vanderhyde had to convince Richie to take back his own bed.

Because defendants offered evidence of Richie's good character, the prosecutor argued he should be allowed to rebut the evidence of Richie's prior convictions for petty theft and providing false information to a police officer. When asked exactly how he sought to introduce the evidence, the prosecutor explained he would only ask Vanderhyde if he was aware of the prior convictions, and if the information would change his opinion regarding Richie's character.

The trial court allowed the inquiry, explaining the evidence had "painted a certain picture" of Richie, and the evidence was elicited without objection. Subsequently, the prosecutor asked Vanderhyde if he was aware of the two prior convictions and if that changed his opinion of Richie. Vanderhyde testified it would not.

On appeal, Richie contends the trial court erred in allowing the prosecutor to introduce improper character evidence against him. We need not decide whether evidence of Richie's prior misdemeanor convictions was properly introduced because even assuming the evidence was improperly admitted, it was clearly harmless. Error in admitting improper character evidence is tested by the standard set out in *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Malone* (1988) 47 Cal.3d 1, 22.) Under this familiar standard, we ask whether it is reasonably probable the defendant would have received a more favorable outcome had the evidence not been admitted. (*People v. Watson*, *supra*, at p. 836.) Upon a review of the evidence we can confidently determine there was no such reasonable probability.

As we have previously indicated, the evidence implicating Richie was strong. Richie lived in the back house. According to the evidence, all the documents found at the residence were addressed to Richie, not Vanderhyde. Richie had several items of paperwork listing the back residence as his home. In addition, evidence established at trial that Richie's mother and sister lived in the front house, further establishing Richie was the occupant of the back house. Some of the methamphetamine was found in plain sight in a medicine bottle on the computer table. The remainder of the methamphetamine

21.

was found in a pair of pants that also contained Richie's wallet. The amount of methamphetamine found was also significant, comprising almost 11 grams.

The residence was small, consisting of one room with a small kitchen and bathroom. There were four digital scales located in a cabinet of the computer desk. Further, there were three methamphetamine pipes in plain view within the room: two in a basket and one in an ashtray next to Richie's bed. There was evidence of a pay/owe sheet also located in the room. While the officers were searching, a cellular telephone rang repeatedly. Officers answered and the caller asked for "Jimmy." Officers inspected the text messages on the telephone and found a message received early that morning that was indicative of drug sales. The home contained a surveillance system with a camera directed at the front door and a police scanner sat atop a table with police codes written on a notepad next to it. The scanner was tuned to the local police department channel.

Given the size of the residence and the location of much of the evidence in plain view, the inference that Richie possessed the methamphetamine for sale was quite strong. Although Vanderhyde testified and claimed ownership of the methamphetamine, much of the evidence contradicted his testimony. Some of the methamphetamine was in plain view in a pill bottle on the table and methamphetamine pipes were also present in the room. Four scales with white residue were found in the cabinet of the desk and Vanderhyde denied those belonged to him. Further evidence of drug sales was found on Richie's cellular telephone.

Additionally, Vanderhyde claimed to buy a significant amount of methamphetamine once a month when he received his government check and then would divide the drug into smaller amounts to regulate his use. However, the methamphetamine found at the residence was not divided up into smaller amounts for a month-long use. Rather, the almost 11 grams of the drug was in four packages of vastly different sizes. Indeed, according to the testimony, one bag had 0.16 grams while another had 1.3 grams. The testimony also demonstrated one of the baggies was consistent with an "eight ball," or 3.5 grams.

Further, the case depended more upon Vanderhyde's credibility than Richie's. Vanderhyde testified the drugs were his and Richie did not know about them. However the character evidence Richie complains of did little to impeach Vanderhyde's credibility regarding the ownership of the drugs.

When considering the prejudicial impact of a prior offense, several factors should be considered. These include the degree to which the prior is similar to the charged offense, how recent the prior occurred, and the relative seriousness or inflammatory nature of the prior compared with the charged offense. (*People v. Wade* (1996) 48 Cal.App.4th 460, 469.) Here, the character evidence related only to Richie's veracity, it did not suggest Richie was a drug user or dealer as the prior convictions were not similar to the charged offenses. Both offenses took place over nine years prior to the trial and were for relatively minor conduct. They did not suggest, as Richie argues, a significant and serious criminal record. Indeed, the prior convictions were significantly less severe than the charges for which Richie was on trial. These factors all indicate the prejudicial impact of the prior convictions was minimal.

Additionally, we note this case is unlike *People v. Ogunmola* (1985) 39 Cal.3d 120, overruled on other grounds in *People v. Ewoldt* (1994) 7 Cal.4th 380, upon which defendant relies. There, the defendant, a doctor, was charged with the rape of two women during their medical exams. The defendant had previously been tried for identical offenses against two different women and acquitted. At trial, the trial court permitted these witnesses to testify as to their encounters with the defendant. The Supreme Court found the prior offenses were improperly admitted. (*Ogunmola*, at pp. 123-124.) In finding the error was prejudicial, the court noted the "fact that the two complaining witnesses were impermissibly corroborated by two others, had to carry much weight with the jury." (*Id*. at p. 124.) In the context of that trial, which "pitted the credibility of the complaining witnesses against that of defendant," the error was prejudicial. (*Ibid*.) This was because when a jury heard the original two offenses, it acquitted the defendant, however, when a jury heard all four offenses, it convicted. (*Id*.

23.

at pp. 124-125.)  Here significant evidence implicated Richie in the prior offenses and the prior offenses were not similar in nature to the charged offenses.  Thus we find *Ogunmola* unpersuasive here.

Regarding the evidence of the prior convictions themselves, we note the only mention of them was during Vanderhyde's cross-examination.  The prosecutor simply asked if Vanderhyde was aware of Richie's prior convictions for petty theft and giving false information to a peace officer and if that information changed his opinion that Richie was a good person.  No other mention of the prior convictions was made during the trial.  There was never another mention of the convictions during later questioning, nor was there any mention of them during closing argument.

In arguing the case was closely balanced, Richie cites the length of the jury's deliberations.  We conclude the length of the jury deliberations suggested the evidence against Richie was strong.  Despite Richie's argument otherwise, it is apparent the jury only deliberated for approximately one and one-half hours before reaching a verdict.  The jury initially began its deliberations sometime in the afternoon of April 17.  The court allowed the jurors to deliberate for a short time[3] before reconvening and questioning one of the sitting jurors about a preplanned vacation.  As the juror had a flight leaving the following morning, the court excused that juror and replaced him with one of the alternates.  The court then instructed the jurors they would be released for the night, but when they returned in the morning, they were required to begin their deliberations anew.  The jurors were instructed to return at 9:00 a.m. the next day.  The next morning, the jury informed the court it had reached a verdict.  The note informing the court of this development noted the time was 10:35 a.m.  Thus it appears the jury deliberated for approximately one and one-half hours.

---

[3]Based upon the statements by the trial court, it appears the court only allowed the jury to deliberate for approximately 25 minutes.

24.

The jury had heard evidence from eight witnesses over a number of days and was tasked with deciding whether each of the two defendants had committed two separate crimes. Given the length of evidence, the number of charges and defendants, and the fact the jury asked no questions, a one-and-one-half-hour deliberation indicates the case against Richie was quite strong.

Considering the entirety of the case, we find no reasonable probability Richie would have received a more favorable outcome had the evidence of the prior convictions been excluded. Thus, any error was harmless.

## V. Defendants' Accounts Receivable Fee Must Be Reduced

At sentencing the trial court imposed an accounts receivable fee of $45 pursuant to former section 1205, subdivision (d) on each defendant. Fees and fines totaling $1,565 were imposed upon each defendant at sentencing. Defendants argue the fee in this case exceeded the statutory maximum and further was inapplicable in this case. Plaintiff concedes the fee exceeded the statutory maximum and must therefore be reduced, however, argues the fee was otherwise properly imposed. We agree the fee exceeded the statutory maximum and will reduce it accordingly.

Former section 1205 was amended after defendants were sentenced in this case. Therefore, we will address the version of section 1205 in effect at both the time the crimes were committed and when defendants were sentenced. The applicable provisions were as follows:

> "(d) The defendant shall pay to the clerk of the court or the collecting agency a fee for the processing of installment accounts. This fee shall equal the administrative and clerical costs, as determined by the board of supervisors, or by the court, depending on which entity administers the account. The defendant shall pay to the clerk of the court or the collecting agency the fee established for the processing of the accounts receivable that are not to be paid in installments. The fee shall equal the administrative and clerical costs, as determined by the board of supervisors, or by the court, depending on which entity administers the account, except that the fee shall not exceed thirty dollars ($30).

25.

"(e) This section shall only apply to restitution fines and restitution orders if the defendant has defaulted on the payment of other fines."
(Former § 1205, subds. (d)-(e); see Stats. 2009, ch. 606, § 9, p. 3052.)

Defendants argue that when read together, former section 1205, subdivisions (d) and (e) do not allow for an accounts receivable fee unless the defendant has defaulted on other fines. We disagree. In construing the meaning of a statute, we begin by looking at the statutory language to determine the legislative intent. We give the words their ordinary meaning, and where the statutory language is clear and unambiguous, we do not go beyond the plain meaning of the statute. (*Green v. State of California* (2007) 42 Cal.4th 254, 260.)

Looking to the plain meaning of former section 1205, subdivision (e), it is apparent the subdivision does not limit the applicability of the section as a whole only to restitution fines. Rather, it specifies the section is applicable to restitution fines and orders only when the defendant has defaulted on other fines. In other words, former section 1205, subdivision (e) only addresses when the section may be applicable to restitution fines and orders, it does not address the applicability of the section to other types of fines. Subdivision (e) does not require a prior default to apply to fines other than restitution fines. Here, the court imposed a $240 restitution fine that comprised only a portion of the overall fines imposed by the court. Thus the remaining fines were subject to the accounts receivable fee provided for in former section 1205, subdivision (d). As the statute only allows for a maximum fee of $30, we will reduce the fee accordingly.

## VI. Defendants Were Not Denied Their Confrontation Rights

Defendants argue their right to confront and cross-examine witnesses was violated when the trial court allowed the prosecution to admit documents establishing their prior convictions. We disagree.

At trial, Vanderhyde sought to exclude the admission of the section 969b packets, citing *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) and argued the admission of the documents violated his right to confront and cross-examine the witnesses against

him.  Counsel also cited the recent Washington Supreme Court case of *State v. Jasper* (2012) 174 Wn.2d 96 [271 P.3d 876], in support of the argument.  Richie joined in the objection.  The trial court held the documents were admissible.

In *Crawford*, the United States Supreme Court overruled decades of precedent and held "testimonial" out-of-court statements could not be admitted against a defendant unless the witness was unavailable to testify and the defendant had a prior opportunity to cross-examine the witness.  (*Crawford*, *supra*, 541 U.S. at p. 68.)  *Crawford* expressly declined to "spell out a comprehensive definition of 'testimonial.'"  (*Ibid*.)  The court did generally describe testimonial statements as those "'that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'"  (*Id*. at pp. 51-52.)  This "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."  (*Id*. at p. 68.)

After *Crawford* was decided, the issue of whether the admission of a record of prior conviction, using the procedure authorized by section 969b, violated the confrontation clause was addressed in *People v. Taulton* (2005) 129 Cal.App.4th 1218.  The court addressed whether the records constituted testimonial statements.  *Taulton* pointed out *Crawford* itself used business records as an example of a statement that is not testimonial.  (*People v. Taulton*, *supra*, at p. 1224.)  Such records are not testimonial because the purpose of the writing is to record an act relating to the business, not to provide evidence in a criminal trial.  (*Ibid*.)  "The fact that such records may, at times, become relevant evidence in a criminal trial, or even that such future use may be foreseeable, does not change the purpose for which the records were prepared."  (*Ibid*.)

*Taulton* held records of a prior conviction as described in section 969b are not testimonial because the documents are "prepared to document acts and events relating to convictions and imprisonments.  Although they may ultimately be used in criminal proceedings, as the documents were here, they are not prepared for the purpose of providing evidence in criminal trials or for determining whether criminal charges should

27.

issue." (*People v. Taulton*, *supra*, 129 Cal.App.4th at p. 1225.) Inexplicably, defendants do not address the court's holding in *Taulton* nor attempt to distinguish it in any way.

After *Taulton* was decided, the Supreme Court addressed the issue of what constitutes testimonial statements within the meaning of the Sixth Amendment in several cases (*Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305; *Bullcoming v. New Mexico* (2011) 564 U.S. ___ [131 S.Ct. 2705]; *Williams v. Illinois* (2012) 567 U.S. ___ [132 S.Ct. 2221]), however, the court still has not agreed upon a comprehensive definition of the term "testimonial." Nevertheless, as our high court has recently noted, the United States Supreme Court opinions have made it clear that in order to be "testimonial" a statement must possess two critical components: (1) it "must have been made with some degree of formality or solemnity" and (2) its "primary purpose pertains in some fashion to a criminal prosecution." (*People v. Lopez* (2012) 55 Cal.4th 569, 581, 582.)

In arguing the section 969b packets are testimonial, defendants primarily rely upon the Supreme Court's opinion in *Melendez-Diaz v. Massachusetts*, which held the admission of a forensic analyst's affidavit reporting the result of a chemical test upon a seized substance constituted a testimonial statement. (*Melendez-Diaz v. Massachusetts*, *supra*, 557 U.S. at pp. 310-311.) In *Melendez-Diaz*, the defendant was charged with distributing and trafficking cocaine. At trial, the trial court admitted three "certificates of analysis" listing the results from the seized substances. These certificates reported the weight of the substance and that the substances had been examined and found to contain cocaine. (*Id*. at p. 308.) In determining whether the documents violated the confrontation clause, the court explained there "is little doubt that the documents at issue in this case fall within the 'core class of testimonial statements.'" (*Id*. at p. 310.) The documents were sworn before a notary and were clearly affidavits made for the purpose of proving some fact. (*Id*. at p. 310.) Further, the court explained, the documents were admitted to prove the substance recovered was cocaine and the certificates were "functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.'" (*Id*. at pp. 310-311.)

In addressing the primary purpose of the affidavits, the court explained the "*sole purpose* of the affidavits was to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substance." (*Melendez-Diaz v. Massachusetts*, *supra*, 557 U.S. at p. 311.) Thus, the documents were made for the purpose of being used at trial and, therefore, testimonial. The affidavits could not be considered business records, which are typically considered nontestimonial, because although kept in the regular course of business, they were "'calculated for use essentially in the court, not in the business.'" (*Id*. at pp. 321-322.)

Curiously absent from defendants' briefs is any mention that the validity of *People v. Taulton*'s holding, in light of the Supreme Court's opinion in *Melendez-Diaz*, was addressed by *People v. Moreno* (2011) 192 Cal.App.4th 692 (*Moreno*). *Moreno* agreed with the conclusion in *Taulton* that records of prior convictions are business records and, therefore, nontestimonial statements. (*Moreno*, *supra*, at p. 710.) Such documents are not prepared for the purpose of use in a future court proceeding; rather, they are "created primarily for the administrative purposes of the Department of Corrections and Rehabilitation." (*Ibid*.) Indeed, *Moreno* explained, "*Melendez-Diaz* strengthens *Taulton*'s holding because, as the high court made clear, documents 'created for the administration of an entity's affairs and not for the purpose of establishing or providing some fact at trial … are not testimonial.'" (*Id*. at p. 711.)

*Moreno* also addressed defendants' argument that because section 969b authorizes the use of such records expressly for the purpose of proving a prior conviction at trial, the documents must be created for the purpose of being used as evidence at trial. As *Moreno* explained, the statute simply describes "the limited evidentiary purpose for which the documents may be introduced at trial, not the reason for their existence." (*Moreno*, *supra*, 192 Cal.App.4th at p. 711.)

*Moreno* also rejected defendants' argument the clerk's certification of the documents is testimonial. As *Melendez-Diaz* explained, a clerk may "by affidavit *authenticate* or provide a copy of an otherwise admissible record, but could not … *create*

29.

a record for the sole purpose of providing evidence against a defendant." (*Melendez-Diaz v. Massachusetts*, *supra*, 557 U.S. at pp. 322-323.) *Moreno* concluded the "clerk's certification of the materials in the 969b packet … is precisely the kind of authenticating affidavit approved of in *Melendez-Diaz*." (*Moreno*, *supra*, 192 Cal.App.4th at p. 711.)

The holdings in *Taulton* and *Moreno* have been routinely followed in California. (See, e.g., *People v. Perez* (2011) 195 Cal.App.4th 801; *People v. Larson* (2011) 194 Cal.App.4th 832.) We agree with the analysis of these cases and likewise adopt it here. Thus, we conclude the admission of the records of conviction in this case did not violate defendants' rights of confrontation and cross-examination as the records themselves cannot be considered testimonial statements.

To the extent defendants rely upon *State v. Jasper*, *supra*, 174 Wn.2d 96 [271 P.3d 876] to support their argument, we find that case clearly distinguishable. *Jasper* dealt with an entirely different type of document, namely, a clerk's certification verifying the absence of a record. This type of certification was also specifically addressed in *Melendez-Diaz v. Massachusetts*, which explained such a "statement would serve as substantive evidence against the defendant whose guilt depended on the nonexistence of the record for which the clerk searched." (*Melendez-Diaz v. Massachusetts*, *supra*, 557 U.S. at p. 323.) *Jasper* concluded such a certification, was created for the "sole purpose of establishing critical facts at trial" and therefore was testimonial within the meaning of the Sixth Amendment. (*Jasper*, *supra*, at p. 115 [271 P.3d at p. 886].) As *Jasper* addressed a wholly different class of documents from those presented in this case, its reasoning is inapplicable to the present case.

The documents presented here were nontestimonial, therefore their admission did not violate defendants' right to confront and cross-examine the witnesses against them. (*People v. Perez*, *supra*, 195 Cal.App.4th at pp. 803-804; *People v. Larson*, *supra*, 194 Cal.App.4th at pp. 836-838; *Moreno*, *supra*, 192 Cal.App.4th at pp. 710-711; *People v. Taulton*, *supra*, 129 Cal.App.4th at pp. 1224-1225.)

## VII.  The Evidence Was Sufficient to Support Vanderhyde's Conviction

Vanderhyde contends the evidence was insufficient to support the inference he was involved in the cultivation of the marijuana found on the property.  He argues there was no reason to disbelieve his testimony he did not know there were marijuana plants growing outside, and the fact he had a paper with marijuana growing instructions on his person was insufficient to support the inference he was involved in cultivating the plants.  We disagree.

When a defendant challenges the sufficiency of the "evidence to support the judgment, our review is circumscribed.  [Citation.]  We review the whole record most favorably to the judgment to determine whether there is substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof."  (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 298.)  Further, we review "the evidence in the light most favorable to the prosecution, [asking whether] *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  [Citation.]  This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution."  (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.)  "Before a judgment of conviction can be set aside for insufficiency of the evidence to support the trier of fact's verdict, it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support it."  (*People v. Rehmeyer* (1993) 19 Cal.App.4th 1758, 1765.)

Vanderhyde does not dispute the elements of marijuana cultivation were proven, only that the evidence did not support the inference he either cultivated the marijuana or aided and abetted in its cultivation.  In order to prove the crime of marijuana cultivation,

31.

the People must prove the defendant cultivated one or more marijuana plants and the defendant knew the substance cultivated was marijuana. (CALCRIM No. 2370.) Here the evidence established there were seven marijuana plants planted in pots outside along a wall of the back house. Two of the plants were mature and were three to four feet tall, while the others were immature and ranged in size from 5 to 18 inches. Some were described as just sprouting. Further, there was an area of fresh soil nearby covered by a tarp.

Vanderhyde bases his claim primarily on two arguments. First, he claims, because he testified the methamphetamine belonged to him but claimed he did not see or have any knowledge of the marijuana plants, there was "no sensible inference on this evidence other than that [he] was being truthful." We disagree. As Vanderhyde concedes, the jury was entitled to accept some, but not all of his testimony as true. As the jury was the ultimate arbiter of credibility, it was of course free to reject his testimony that he did not know of the marijuana's presence, solely possessed all the methamphetamine, and possessed it only for personal use.

Vanderhyde next claims his testimony about his limited mobility precluded an inference he was engaged in the cultivation of the plants. Not so. While the evidence established Vanderhyde had injured his leg, there was also testimony he was able to move about on crutches. He testified that after 10 days he was well enough to move from Richie's bed to the floor. Also, he testified he smoked his methamphetamine in the bathroom to keep it from Richie. Thus, since Vanderhyde was mobile enough to move freely to the bathroom to smoke methamphetamine undetected during his stay, the jury could infer he was likewise mobile enough to care for the marijuana plants outside of the residence. Vanderhyde testified he had been staying at Richie's residence continuously since April 28, 2011, just over two weeks prior to the search. Some of the marijuana plants had just sprouted, according to Funderburk, thus leading to an inference they were planted recently. Furthermore, the fact there was fresh soil outside could lead to the

reasonable inference that preparations were being made to move the plants from pots to the ground.

The evidence at trial clearly established Vanderhyde both smoked marijuana, possessed the processed marijuana found inside the residence, and had an interest in growing marijuana. At the time of his arrest, Vanderhyde possessed instructions on how to grow marijuana. The facts that he had a clear interest in growing marijuana, had actually taken steps to research how to grow marijuana, admitted to using and possessing marijuana all led to the reasonable inference he was engaged in growing the marijuana found outside of the house. Thus, we reject his claim.

## DISPOSITION

The section 1205 accounts receivable fee of $45 is reduced to $30 for both defendants. The trial court is directed to issue a corrected minute order reflecting the modification. As modified, the judgments are affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
CORNELL, Acting P.J.


_____
GOMES, J.